Alice E. YOUNG, as Administratrix of the
Estate of Henry E. Young, Deceased,
Plaintiff,

v.

UNITED STATES of America,
Defendant and Third-Party
Plaintiff,

v.

TIDEWATER CONSTRUCTION CORPO-
RATION, Third-Party Defendant.

Civ. A. No. 1102.

United States District Court
D. South Carolina,
Charleston Division.

Sept. 6, 1967.

Gedney M. Howe, Morris Rosen,
Charleston, S. C., for plaintiff.

Bertram E. Snyder, Dept. of Justice,
Washington, D. C., Thomas P. Simpson,
Asst. U. S. Atty., Charleston, S. C., for
defendant & third party plaintiff.

Moore, Mouzon & McGee, Charleston,
S. C., for third party defendant.

## ORDER

SIMONS, District Judge.

On October 24, 1958 plaintiff, Alice
E. Young, Administratrix of the Estate
of Henry E. Young, deceased, brought
suit in Admiralty against the United
States seeking damages for the death of
her husband allegedly caused by the Gov-
ernment's negligence. On April 2, 1958
Young was employed as a carpenter by
Tidewater Construction Corporation
(herein referred to as "Tidewater")
while it was constructing a new pier for
the United States Minecraft Base on the
Cooper River near Charleston, South
Carolina. Young died by drowning on
this date as a result of his being thrown
into the river when the unfinished pier
on which he was working was struck by

the United States Minesweeper DE-TECTOR.

The United States filed an impleading petition against Tidewater charging that Tidewater's contract breach was the sole cause of plaintiff's decedent's death. The United States settled the main suit with Young's Administratrix for $42,-500.00, Tidewater agreeing that this was a "reasonable settlement". The United States reserved its right against Tidewater. The third-party action came on for trial July 10, 1967 and, in accordance with Rule 52 of the Federal Rules of Civil Procedure, I make specially the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. On April 2, 1958 Tidewater Construction Corporation, a general contractor, had for some time been engaged and was then engaged in the building of piers and other facilities under a contract dated April 15, 1957 and numbered NBY–13174 with the United States by the Department of the Navy, Bureau of Yards and Docks, for the construction of a new minecraft base on the Cooper River near Charleston, South Carolina.

2. Contract No. NBY–13174 provided in part as follows:

"ADDITIONAL GENERAL PROVISIONS

(CONSTRUCTION CONTRACT)
28. PERFORMANCE OF THE WORK

\* \* \* \* \* \*

(d) *Accident Prevention.*—In order to provide safety controls for protection to the life and health of employees and other persons; for prevention of damage to property, materials, supplies, and equipment; and for avoidance of work interruptions in the performance of this contract; the contractor will comply with all pertinent provisions of the publication "Safety Requirements" (Revised 1951) prepared by the Department of the Army, Corps of Engineers, U. S. Army, and published by the U. S. Government Printing Office, and as may be amended, and will also take, or cause to be taken, such additional measures as the Officer in Charge of Construction may determine to be reasonably necessary for the purpose." (Respondent's Exhibit No. 7).

3. The publication "Safety Requirements" (Revised 1951) prepared by the Department of the Army, Corps of Engineers, referred to in the General Provisions of Contract No. NBY–13174 provided in part as follows:

"LIFE PRESERVERS

7–14. Life Preservers, ring buoys, and other marine lifesaving equipment shall be provided as required under United States Coast Guard regulations.

7–15. Other life preservers, or work vests, of any type are permissible provided the buoyancy when new is at least of 16½ pounds. All life preservers or work vests shall be removed from service when buoyancy depreciates below 13 pounds.

7–16. Life preservers, vests, or belts shall be worn by all persons while—

a. On floating pipeline, pontoons, rafts, float stages, etc.

b. On open deck floating plant not equipped with bulwarks, guardrails, or life lines.

c. On structures extending over or adjacent to water except where proper guardrails or safety belts and life lines are provided.

d. Working alone at night where there are potential drowning hazards regardless of other safeguards provided.

e. In Skiffs, small boats, or launches except when inside of enclosed cabin or cockpit." (Respondent's Exhibit No. 8).

4. While engaged in the minecraft job Tidewater provided life jackets which were readily accessible for all its workmen, and repeatedly instructions were given by its supervisory personnel, including E. J. Wilson, the carpenter fore-

man under whom Young was working, that life jackets must be worn in accordance with the regulation referred to above.

5. Henry E. Young was a carpenter employed by Tidewater on the Minecraft Base job. On the morning of April 2, 1958, Young and another carpenter, Sandy M. Allen, were working on shore away from the water when the carpenter foreman, E. J. Wilson, told them that they were to go out to Pier Nine where he would show them some work he wanted them to do. The two men were not told to pick up life jackets and did not do so. Though Allen worked on the river frequently, Young's assignment under the pier was his first on the water. The assigned work which was to "form in" on Section 18 of Pier 9 would be done from underneath the pier. Young and Allen got into a jackboat, which the latter sculled out to the desired spot, where the jackboat was tied to the piling under Pier 9.[1] Against the strong tide, it took Allen from five to seven minutes to *scull* the jackboat out to Section 18 of Pier 9, which was about 340 feet from shore.

6. Wilson who had stayed behind to attend to some other business walked out on the pier to meet Young and Allen. He was not aware that neither of them was wearing a life jacket as required by the rules. The jackboat occupied by Young and Allen was tied up alongside another jackboat already at the same end occupied by another carpenter, Pigate, who had been working at this spot for some time and who was wearing a life jacket.

7. The work to be done by Young and Allen was the filling of a square opening in a concrete slab forming a part of the deck of the pier. This opening was about three feet square and around the sides of it were the projecting ends of steel reinforcement rods which had been cut off when the opening was made. The deck of the pier was a considerable distance above the jackboat in which Young and Allen had arrived and, since their work would involve getting materials from the deck, Allen caught a rope around one of the projecting steel rods and tied two or more loops in the rope to serve as a ladder to climb from the boat to the topside of the pier.

8. Allen had climbed up this rope onto the pier and was picking up some material when Mr. Wilson arrived about ten minutes after they had first tied up their jackboat. Wilson stooped down and for about a minute and a half talked through the square hole to Young and Pigate in the boats below, giving them directions about the work. He did not notice that Young was not wearing a life jacket.

9. Prior to Wilson's arrival, Pigate in the other jackboat had noticed that Young had no life jacket and, when a passing vessel caused some motion of the boats under the pier, he cautioned Young that he should be wearing a life jacket, but Young assured him that he did not need one because he was a good swimmer. There were life jackets available on the deck of the pier near the hole above mentioned.

10. The United States Minesweeper DETECTOR (MSO–429) was on her way up the Cooper River. She had no relation to nor connection with the work being done by Tidewater in the construction of the minecraft base. She passed the end of Pier Nine and had proceeded for some little distance when her steering gear failed, she lost power, swung about, and headed down stream straight into Pier Nine. She dropped anchor as an emergency measure as she approached, which did not hold. Men on the pier, including Wilson and Allen, shouted warnings when they saw the DETECTOR headed in their direction, apparently out of control. The DETECTOR gave no warning of her approach except that of an officer waving his arms, and perhaps by the sounding of a whistle just as she was about to strike the pier.

---

1. "Sculling" is towing by the use of a single long oar worked over the stern of the boat. Among Tidewater's employees on April 2, only Allen could scull.

The "jackboat" was a motorless, broad and heavy steel flat bottomed craft with flotation chambers along the sides.

11. When Allen shouted a warning down through the hole to the men in the jackboats below, Pigate jumped overboard, and Young endeavored to get up on the pier by way of the looped rope. Allen and another workman, Ed Spiers, got him by the arms and tried to pull him through the hole but a loop or pocket on his overalls caught on one of the projecting steel rods and had to be freed before he could get through. He had come out to the deck of the pier in a crouched or kneeling position just as the DETECTOR struck. The collision occurred about 9:14 a. m. on the upstream side of the new pier just opposite the hole where the men were working, knocking out several concrete slabs including the one where Allen and Spiers were standing. At that moment Young had not had time to straighten up after his emergence from the hole. Allen and Spiers leaped to safety on adjoining concrete slabs, but as the slab on which Young was standing reared up, he was seen to fall backward through the hole and disappear while concrete slabs crashed into the water about him.

12. There was a strong ebb tide running which carried Pigate downstream. Nothing could be seen of Young for some time, variously estimated by the witnesses as from one to one and one-half minutes. Then suddenly his head and shoulders "popped up" from the water, as if his body had been released from some restraint. All of the witnesses agreed that they saw no sign of life in Young after his head appeared above the surface. His body was apparently floating in an upright position and he was bobbing up and down, so that sometimes his entire head would emerge and again nothing except the top of his head would be visible. In response to shouts from the men on the pier, Pigate, who still had on his life-jacket, turned back and got hold of Young's body. Pigate was in the water from two to three minutes before he reached Young. Both Pigate and Young went under several times and then came up again. Pigate supported Young with great difficulty by treading water for approximately ten to fifteen minutes.

During this period Young's eyes were closed, and he made no sound nor moved. Pigate was unable to maintain his hold on Young and he finally disappeared from sight. Pigate himself caught hold of the piling on the next pier downstream, from which he was rescued after being in the water for over an hour. At no time did anyone else observe any sign of life from Young and obviously, if he were not dead, he was completely unconscious.

13. Several days after the accident a derrick barge pulled up the concrete slab with the hole in it through which Young had climbed. A witness standing nearby saw a worker's helmet wedged between the steel rods on one side of the hole. The cable hauling up the slab broke causing it to fall back into the water, and when it was again recovered, the helmet was gone. It is reasonable to assume that this was the helmet worn by Young, which was knocked from his head when he fell backwards through the hole.

14. Dr. H. R. Pratt-Thomas, the pathologist who performed the autopsy on Young's body when it was recovered after some ten days submergence in the river, thought it probable that Young's death was due to drowning. He expressed no opinion as to when Young died—whether he was dead when Pigate reached him or died later. He did testify, however, that when Young first "popped" to the surface he was most probably alive at that time since he had been underwater for a hypothetical one and one-half minutes. His examination also showed that Young suffered no skull fracture or punctured organs, but that he did suffer some bruising of the scalp. There was, therefore, from Dr. Pratt-Thomas' clinical findings no evidence to indicate any cause of death other than drowning.

15. Dr. Pratt-Thomas was extensively examined about the mechanics of asphyxiation by drowning. He testified that normally a drowned man would not "pop" to the surface and float. A person drowns from asphyxiation or suffocation caused by water filling the lungs. The lung cavity filled with air causes one to float normally in water; as the lungs are

filled with water the body's natural bouyancy is destroyed causing it to sink. Nevertheless, one's heart may continue to beat in spite of the lack of oxygen. It is common knowledge and the witness testified that it is for this reason that artificial respiration and removal of water from the lungs thereby can revive a person who appears to be dead. Dr. Pratt-Thomas further testified that the extremes of times necessary for an unconscious person to die by drowning are from two to ten minutes. He frankly admitted, however, that he had no opinion or even an educated guess as to whether Young was alive after being released by Pigate.

16. The Government has not shown by the greater weight or preponderance of the evidence that Young died of drowning after having been released by Pigate, or that Young's failure to have on a life jacket was the cause of his death. Young obviously was unconscious, probably by a blow to the head either when the DETECTOR struck, or when he fell, or by a blow from the falling concrete slabs. In this condition he was powerless and much more susceptible to swallowing water. He was even without Pigate's assistance to keep his head above water for a minimum of one and one-half minutes. He was thus totally exposed in the water for a minimum of twelve minutes or a maximum of eighteen minutes before Pigate finally released him. When Pigate released Young, he *sank*. To say that Young was alive at this stage is pure speculation.

17. Young's death as aforesaid could surely not have been a reasonably foreseeable result of Tidewater's failure to require him to wear a life jacket. The only reasonable conclusion under the circumstances is that the intervening independent negligence of the United States in the operation of its naval vessel was the sole proximate cause of Young's death. The court would reach the same conclusion even if the government had shown, which it did not, that Young's death resulted after he had been released by Pigate.

## CONCLUSIONS OF LAW

1. The court's jurisdiction to entertain plaintiff's suit filed in admiralty against the United States under the provisions of the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., and the Public Vessels Act, 46 U.S.C.A. § 781 et seq., is not challenged. Nevertheless, in its Reply to the Impleading Petition of the United States, Tidewater raised two objections to its being impleaded. One of these has been abandoned, but, in the other Tidewater maintains that the claim of the United States against it is a claim of indemnity arising out of the alleged violation of a construction contract which Tidewater maintains is non-maritime in character, and that such a claim cannot be litigated in a suit in admiralty, and is therefore not within the provisions of Admiralty Rule 56. See Capital Transp. Corp. v. Thelning, 167 F.Supp. 379 (E.D. S.C.1958, Wyche, J.). On the other hand, the government argues that Tidewater has waived its right to a jury trial by failure to demand such under Rule 38 of the Federal Rules of Civil Procedure. It contends that since July 1, 1966, when the amendments to the Federal Rules became effective, Admiralty Rule 56 has been surplanted by Civil Rule 14, which applies to all suits of a civil nature, including Admiralty Cases. Since Civil Rule 86(e) provides that the new amendments "govern all proceedings in actions brought after they take effect and also all further proceedings in actions then pending, except to the extent that in the opinion of the court their application in a particular action pending when the amendments take effect would not be feasible or would work injustice, in which event the former procedure applies," the government contends that Civil Rule 14 applies since no injustice results in the present case. Since Civil Rule 14 supports the third party action, the government's further logic is that Tidewater's failure to demand a jury trial within ten days after issues were joined as provided by Civil Rule 38 constituted a waiver of trial by jury. This court cannot agree with such a premise. In Aktieselskabet

Fido v. Lloyd Braziliero, 283 F. 62 (2nd Cir. 1922) cert. denied, 269 U.S. 737, 43 S.Ct. 97, 67 L.Ed. 489, the court found that such a construction of Admiralty Rule 56 to implead a party over whom the court would otherwise have no jurisdiction had Constitutional objection. Indeed, Judge Wyche presiding in this same court likewise followed *Aktieselskabet* in the *Thelning* case, supra. For this court to now follow the government's logic would violate both the letter and spirit of Civil Rule 86(e). Nevertheless, in order to fully resolve the case after hearing the evidence, and in order to save a possible remand, I have also conditionally ruled on the merits even though I have determined that the court has no jurisdiction.

■ 2. The government's action against Tidewater is premised in part on a tortious breach of the express provisions of Contract NBY–13174. It finds authority in Keifer & Keifer v. Reconstruction Fin. Corp., 306 U.S. 381, 59 S. Ct. 516, 83 L.Ed. 784 (1939), and United States v. Huff, 165 F.2d 720, 1 A.L.R.2d 854 (5th Cir. 1948). It contends that Tidewater breached the express terms of the contract when it allowed Young to work without a life jacket, and is responsible for the "foreseeable" damages stemming therefrom. Gulf States Creosoting Co. v. Loving, 120 F.2d 195 (4th Cir. 1941); Dawkins v. National Liberty Life Ins. Co., 252 F.Supp. 800 (D.S.C. 1966) (Hemphill, J.). The Fourth Circuit stated this rule of proximate cause in Rederi A/B Dalen v. Maher, 303 F.2d 565 (4th Cir. 1962), when applied to the case of a breach of warranty. The worst that can be said of Tidewater's failure to see that Young wore a life jacket is that it created a potentially dangerous situation, but even so, Young's injuries and death were due to an entirely independent unforeseeable intervening cause, the striking of the pier by the DETECTOR. There can be no doubt that this was the direct and proximate cause of Young's death.

3. Another theory sued on by the government is that of breach of implied warranty of workmanlike service to perform the requirements of the contract properly and safely. In the recent case of Italia Societa v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964), the United States Supreme Court laid down a strict rule of indemnity in these types of cases, the basis for liability including both negligent and nonnegligent conduct alike. Id., at 321, 84 S.Ct. 748. See also Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), and Rederi A/B Dalen v. Maher, 303 F. 2d 565, (4th Cir. 1962), which preceded the *Italia Societa* case. What the government overlooks, however, is that it cannot recover indemnity from Tidewater except upon proof that such breach *caused* Young's death. The Fourth Circuit in the *Maher* case, supra, stated at page 567:

"If a shipowner can show that the stevedore's breach of warranty has occasioned it expense, reimbursement is due. Of course, the shipowner must prove that the stevedore, in fact, breached its warranty and caused the injury for which the shipowner was potentially liable".

See also American Export Lines v. Norfolk Shipbuilding & Drydock Corp., 336 F.2d 525 (4th Cir. 1964), where the court again quoted this language with approval. So in the present case, in order to recover against Tidewater, the United States must prove not only that Tidewater breached its implied warranty but that such breach caused Young's death. As before discussed it is my conclusion that Young's death was occasioned by an entirely independent unforeseeable intervening act—the collision of the DETECTOR with the pier.

4. The stated purpose of bringing the "Safety Requirements," including the life jacket rule, into Tidewater's contract with the United States was the protection of life and health, prevention of damage to property and equipment, and avoidance of work interruption; but obviously a primary purpose was to protect the United States from claims by Tidewa-

ter's employees arising out of the work called for by the contract. The claim for which the United States now seeks indemnity from Tidewater did not arise from work done under the contract; it arose from the negligence of the United States in the operation of the DETECTOR, which was entirely outside and independent of Tidewater's contract. The fact that the vessel which caused Young's death was owned and operated by the United States, the party with whom Tidewater had contracted, was purely accidental and coincidental. From the evidence the court is unable to conclude that there was a breach of contract NBY–13174, or even a breach of implied warranty of workmanlike service. Likewise, as before discussed it is also concluded that, even if there were such a breach, it was not the cause of Young's death. For the foregoing reasons, it is

Ordered that the claim of the United States for indemnity from Tidewater Construction Corporation be, and the same is denied, and the impleading petition dismissed.

And it is so ordered.