## THE GOYAZ.

(Circuit Court of Appeals, Second Circuit. November 3, 1924.)

Nos. 49, 50.

1. **Shipping** ⊗⇒132(3)—Libelant held to have burden of proving good condition of hides when stowed and that bad condition on delivery was due to sea water.

Libelants, who alleged delivery of cargo of hides in good condition and receipt in bad, and that damage was due to sea water and unseaworthiness of vessel, *held* (the bills of lading not acknowledging receipt in good condition) to have burden of proving by fair preponderance of credible testimony both that hides were in good condition when stowed and that bad condition on delivery was due to sea water.

2. **Shipping** ⊗⇒132(5)—Repair of vessel raises no inference of prior unseaworthiness or unfitness for cargo.

Making of repairs furnishes no inference that vessel was unseaworthy or not cargoworthy before receiving such repairs.

3. **Admiralty** ⊗⇒122—Parties impleaded by claimant of vessel held entitled to recover costs of claimant.

Charterers, who were also vendors of hides, who shipped, stowed, and dunnaged them, and who were impleaded under admiralty rule 50 by claimant of vessel libeled to recover for damages en route, *held* entitled to recover costs of claimant.

Manton, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the Southern District of New York.

In admiralty. Libels by the Central Leather Company and by Schnoll, Fils & Co. against the steamship Goyaz, her en-gines, etc., and Lloyd Braziliero, claimant, wherein Thomsen & Co. was impleaded. From decrees of dismissal (281 F. 259), libelants appeal. Affirmed.

Certiorari denied 45 S. Ct. 230, 69 L. Ed. ——.

The Goyaz carried from Rio Grande do Sul, Brazil, to New York, a large number of hides, of which libelants were the owners. The hides were shipped, stowed, and dunnaged by Thomsen & Co., who at the time were charterers of the steamship. They were also the vendors of the hides. Bills of lading were issued for this cargo reciting receipt from Thomsen, but containing no acknowledgment that the hides were in good order at the time of shipment, nor any other statement regarding their condition. On arrival at New York, after a passage on which the steamship encountered no sea peril that should have been injurious to the cargo of a well-found and seaworthy ship, many hides were found in bad condition. Some 50 hides belonging to Central Leather Company were confessedly rotted by sea water, and these hides were found at one place, to wit, the after starboard corner of No. 2 hold. This rot was admittedly caused by sea water which had risen above the bilges, and for this damage the proper libelant took a decree.

Both the libels alleged shipment of the hides in good order and condition and delivery seriously damaged by contact with sea water; such damage being the result of the negligence of the Goyaz, her owners and/or charterers in respect of the loading, stowage, custody, and care of said hides and through "the unseaworthiness of the said steamship."

The answers denied that the hides were in good order and condition when delivered to the steamship. They also denied unseaworthiness and set up what turned out to be the facts with regard to the loading, stowing, etc., of the hides by Thomsen & Co.

Claimant then impleaded Thomsen under the then fifty-ninth rule, alleging inter alia that, however bad the condition of the hides on arrival in New York, the same was due either to the negligence of Thomsen & Co. or to the unsound condition of the hides at the time they were laden on board.

The parties impleaded denied that the injured condition of the hides was due to their unsound condition at the time of delivery to the vessel, but admitted that they had shipped on board the Goyaz a full cargo of wet salted hides, averring that said hides were properly stowed and dunnaged in

accordance with the custom of the port of shipment.

The case was tried in open court at great length, and many witnesses orally examined after claimant and Thomsen & Co. had taken 191 depositions in Brazil; the testimony there obtained being as to the condition of the hides when shipped and the method of loading, stowage, and dunnage.

The court below dismissed the whole libel of Schmoll, but gave Central Leather Company a decree only for the above referred to hides damaged by sea water, dismissed both libels as against Thomsen, and granted that concern costs as against the claimant which had brought them in. From decrees accordingly libelants appealed.

Bigham, Englar & Jones, of New York City (D. Roger Englar and Henry B. Potter, both of New York City, of counsel), for libelants-appellants.

. Purrington & McConnell, of New York City (William A. Purrington, Frank J. McConnell, and James D. Brown, all of New York City, of counsel), for claimant-appellee.

Burlingham, Veeder, Masten & Fearey, of New York City (Charles Burlingham and Carl G. Stearns, both of New York City, of counsel), for Thomsen & Co.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). These appeals present but a single question of fact: That question arises from the pleadings in the following manner:

Libelants charge that the hides went aboard in good condition and came off in bad. Prima facie that was enough to make out their case, if true; but libelants went further and averred that the damage was caused by contact with sea water, and the unseaworthiness of the Goyaz, while claimant denied not only the initial good condition of the hides, but the fact of injury by sea water and the allegation of unseaworthiness.

[1] As libelants had no admission in the bill of lading on which to rest, the burden was on them to prove: (1) That the hides were in good condition when stowed, and (2) that the bad condition on delivery was due to sea water. And of course this burden libelants had to carry by a fair preponderance of credible testimony.

What was actually the matter with the hides, i. e., their condition when unladen, and the probable cause of that condition,

were something that eyewitnesses in New York could testify about, and they did at great length. But the condition of the hides at Rio Grande was something of which no witness producible in New York could speak, and the investigation of that subject was the excuse given for an open commission to Brazil.

Of course, even bad hides might be made worse by exposure to sea water in the hold of a vessel, but it remained true that the burden was on libelant to show sea water damage. It was not enough to show that poor hides or injured hides came out of the Goyaz. It was necessary to prove that that injury resulted from something that the ship was responsible for, and there is no suggestion of any ground for the ship's liability except letting sea water in on the cargo. The case was carefully tried on this issue by Ward, C. J., in the court below, and after considering the voluminous evidence and the careful opinion of the court, we find it unnecessary materially to add to it. It is enough to indicate that we agree with every proposition advanced in the opinion, and substantially for the reasons there given. There is in respect of hides a real difference between what the witnesses call commercial damage and actual damage. A hide may make perfectly good leather and yet may be in a condition of superficial putrefaction, evidenced by a discoloration on the inside of the hide and a looseness of hair on the outside. But if this process of decay has not affected the "grain" of the hide, it makes good leather; but inasmuch as the extent or acuteness of decay cannot be judged with certainty, hides so affected sell in their raw condition for less than those unaffected. This is commercial damage. And this was the matter with the hides complained of. There is no evidence that any of the hides, other than the approximately 50 that were rotted with sea water, did not ultimately make good sound leather, though it is probable that some of them did not. Consequently as the case developed, the vital question was whether the undoubted commercially bad condition of the hides was due to sea water that had leaked into the hold. We shall not go into the details of testimony; as above noted, that has been sufficiently done; we merely indicate the following points as in our opinion important and strongly tending to sustain the result below:

1. We regard the evidence produced in open court from men of repute and experience in this trade as upon the whole showing that the bad or damaged hides found on

unloading the vessel did not show the kind of injury or rot that would result from long exposure to sea water.

2. The commercially damaged hides were scattered all through the cargo except for the small lot hereinabove noted. If the damage had been by sea water, no such wide scattering of injured articles would have been observed. Even if all the hides had not been injured, the injured ones would have been in groups where the sea water had accumulated and rested.

3. We see no reason to doubt the evidence that when the hatches were taken off in New York the top layer of salt was intact, or substantially so. If, as is so strongly urged, the salt water leaked through the decks, it would naturally first have melted this salt.

We agree with the remarks of the court below concerning the evidence taken in Brazil, which is too evenly balanced in quantity and seemingly too well drilled to command confidence. The one thing that the Brazilian witnesses all agreed about was that the stowage was good—at all events, there is no evidence of bad stowage.

In our opinion it is plain that the libelants have not sustained the burden of showing by a fair preponderance of evidence that the commercially unsound condition of the hides on delivery was due to anything that the ship did or failed to do, and particularly such condition was not due to rotting by sea water which came aboard during the voyage.

[2] We have nothing to add to Judge Ward's comments on the repairs executed to the Goyaz while in New York. Said repairs furnished no ground for holding that the steamship was unseaworthy or not cargoworthy before she received the repairs.

[3] Neither do we perceive any reason why the claimant which brought in Thomsen & Co. should not pay the costs of the latter.

Decrees affirmed, with one bill of costs.

MANTON, Circuit Judge (dissenting). This record is voluminous. My study of it caused me to resolve the questions of fact very materially different than the result reached by the majority opinion. The damage to this cargo of hides is about one-third of the full load. The surveyors reached this conclusion. It is very unlikely that any such large quantity of damaged hides were shipped as marketable. The evidence demonstrates that they were not shipped in any such condition. They were purchased from a reputable and responsible seller, and their good condition is fully established by reputable witnesses whose duty it was to see and know their condition—the merchants from whom they were purchased, the inspectors, the receivers at the barracas at Rio Grande, the tally clerks, the contracting stevedores who loaded them, and many disinterested witnesses. As well, many of the laborers who loaded the ship proved the claim of the hides being in good condition when shipped. Some laborers who were but temporary longshoremen gave testimony as to reddish, bluish, and greenish colors in the hides. These colors became so common in the description by them, that the hides must have been in better condition upon their arrival in New York than when shipped, for the experts who examined them in New York found no such numbers so discolored. There is little dispute that the hides were properly pickled and stowed. They came out of the vessel in a wet and dripping condition, which is never found in the case of sound hides. The experts saw pools of water standing on the hides in various compartments of the ship. They saw a considerable number of hides showing a darkening of the fleshy side (not merely pinkish, or reddish in color), also a slipping of the hair in various degrees. They were quite unanimous in saying such a condition was due to sea water. Even the experts who did not see the hides in the compartments of the ship, but who saw them on the dock, thought they were damaged by sea water. There was an intermixture of sound and damaged hides on the pier, and this seems to have led to the assumption that they were in the same relative position on the ship. They were not. The experts say that a reddish appearance does not necessarily indicate that the hides were damaged. The experts all say that there was an excess of water in the hides and refer to their flabby condition. The fact that there was a layer of salt found over the top of the hides at the deck does not answer the claim of the entrance of sea water, for the salt would only be disturbed at the points of entry of the water. No claim is made that water came over the entire upper surface of the hides. Water came through the weather deck, chain pipes, and forecastle sounding pipes, and undoubtedly in other places. A layer of salt was found in the upper compartment, the shelter deck space. This does not account for the between decks and lower hold.

After the voyage, repairs were made to the teakwood weather deck, the entire plumbing equipment was repaired, various sounding pipes and caps, and the bulkhead plates were taken out and new ones put in

their place. The log entries show "seas of a boisterous state"; water in the bilges "through seas having boarded the ship forward and amidships." All of the water did not run aft in the bilges, but had drained down into the bilges from the upper cargo compartments. At least part of the water leaked down from between decks. There undoubtedly was a very considerable and constant leakage through the wooden deck owing to its general defective condition. The log shows seas sufficiently high to have supplied the sea water for these leaks. The ship required $130,000 for repairs for the voyage, and the parts repaired tell in part the story of where the leaks were. With the burden of proof on the appellee to establish that its vessel was seaworthy and explain the entrance of sea water (The Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; The Edwin I. Morrison, 153 U. S. 199, 14 S. Ct. 823, 38 L. Ed. 688; The Rosalia (C. C. A.) 264 F. 285), it has failed lamentably. It has failed to establish its fulfillment of the contract of carriage, and the appellant has fully sustained its claim of a breach thereof.

I therefore dissent.