**LEATHER'S BEST, INC., Plaintiff-Appellee-Cross Appellant,**

v.

**S.S. MORMACLYNX et al., Defendants-Appellants-Appellees.**

**No. 36, Docket 35562.**

United States Court of Appeals, Second Circuit.

Argued Sept. 22, 1971.

Decided Oct. 29, 1971.

Mulligan, Circuit Judge, filed an opinion dissenting in part.

F. Herbert Prem, New York City (Bigham, Englar, Jones & Houston, New York City, of counsel), for plaintiff-appellee-cross appellant.

John H. Reilly, Jr., New York City (Hyde, Dickerson & Reilly, New York City, of counsel), for defendants-appellants-appellees.

Kirlin, Campbell & Keating, New York City (Walter P. Hickey and Richard H. Sommer, New York City, of counsel), for United States Lines, Inc., as amicus curiae.

Before FRIENDLY, Chief Judge, and MULLIGAN and TIMBERS, Circuit Judges.

FRIENDLY, Chief Judge.

The facts of this case, which has already attracted considerable attention in maritime legal circles,[1] are simple; the legal problems, some of them not apprehended by the parties, are difficult.

Plaintiff Leather's Best, Inc. ("the shipper") purchased some 11 tons of leather in 1967 from Carl Freudenberg, whose plant was at Weinheim, Germany. The seller's employees loaded the leather into 99 cartons, averaging 4' in length, 2' in width, and 1½' in height, and placed steel straps around them, thereby making them qualify as "bales" under the applicable tariff, which provided a fixed price per kilogram for leather in bales or rolls. At the request of the Freudenberg firm, a truckman engaged by the agent of Moore-McCormack (Mooremac) in Germany delivered to the plant a metal container owned by Mooremac which was 40' long, 8' high and 8' wide. With the truck driver watching, the seller's employees loaded the container and sealed it. The truck driver gave a receipt.[2]

The driver delivered the container to the S.S. Mormaclynx at Antwerp, Belgium. Mooremac's agent at Rotterdam, Holland, issued a bill of lading which described the goods as follows:

| Marks & Nos. | Number and kind of packages; description of goods | Gross Weight | Measurement |
|---|---|---|---|
| C F W NEW YORK MADE IN GERMANY 2202/1–99 | 1 container s.t.c. 99 bales of leather | 10864 | kos. |
| Container nr. UB 9622　209134 HOUSE-TO-HOUSE Seal Nr. 26844 | | | |
| SHIPPER'S LOAD AND COUNT | IN TRANSIT | | |

The lower left hand corner of the bill of lading stated, in legible capital letters:

SHIPPER HEREBY AGREES THAT CARRIER'S LIABILITY IS LIMITED TO $500 WITH RESPECT TO THE ENTIRE CONTENTS OF EACH CONTAINER EXCEPT WHEN SHIPPER DECLARES A HIGHER VALUATION AND SHALL HAVE PAID ADDITIONAL FREIGHT ON SUCH DECLARED VALUATION PURSUANT TO APPROPRIATE RULE IN THE CONTINENTAL NORTH ATLANTIC WESTBOUND FREIGHT CONFERENCE TARIFF.

The following clauses on the back of the bill of lading are also relevant:

1. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, except that when issued to cover carriage of goods to Canada it shall have

---

1. See Case Note, 2 J. Maritime L. & Commerce 190 (1970). See also Schmeltzer & Peavy, Prospects and Problems of the Container Revolution, 1 J. Maritime L. & Commerce 203 (1970).

2. There is considerable debate whether the trucker was acting on behalf of Mooremac or Freudenberg. On the facts here, we think it most appropriate to treat the trucker as acting on behalf of Mooremac.

effect subject to the provisions of the Canadian Water Carriage of Goods Act, 1936. The provisions of each of said Acts which are hereby contracted for, exempt the carrier from liability for loss or damage arising or resulting from: unseaworthiness unless caused by want of due diligence; act, neglect, or default of the master, mariner, pilot or the carrier's servants in navigation or management of the ship; fire unless caused by actual fault of privity of the carrier; perils, dangers and accidents of the sea or other navigable waters; act of God; act of war; act of public enemies; arrest or restraint of princes, rulers, or people, or seizure under legal process; quarantine restrictions; act or omission of the shipper or owner of the goods, his agent or representative; strikes or lockouts or stoppage or restraint of labor from whatever cause, whether partial or general; riots and civil commotions; saving or attempting to save property or life at sea; wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods; insufficiency of packing; insufficiency or inadequacy of marks; latent defects not discoverable by due diligence; any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of its agents or servants. During any period when neither of said Acts applies by its own force the carrier, if responsible in any capacity for the goods, shall not be liable for loss or damage arising or resulting from any of said causes or from any cause whatsoever not proved due to the negligence of the carrier which shall also be entitled to all of the rights, immunities, exemptions and limitations stated in this bill of lading. The carrier shall not be liable in any capacity for any delay, non-delivery, misdelivery or loss or damage occurring while the goods are not in the actual custody of the carrier.

2. In this bill of lading, the word "ship" shall include any substituted vessel, and any craft, lighter or other means of conveyance owned, chartered, operated or used by the carrier in performing this contract; the word "carrier" shall include the ship, her owner, operator, demise charterer, time charterer, master and any substituted carrier, whether acting as carrier or bailee, and all persons rendering services in connection with performance of this contract; the word "shipper" shall include the person named as such in this bill of lading and the person for whose account the goods are shipped; the word "consignee" shall include the holder of this bill of lading, properly endorsed, and the receiver and the owner of the goods; the word "charges" shall include freight and all expenses and money obligations payable by the goods, shipper, consignee, or any of them; the words "at the risk and expense of the goods" or the like mean, in addition, at the risk and expense of the shipper and consignee; the words "government" and "authorities" shall each include the United Nations or any similar international organization, as well as a sovereign state or political subdivision thereof, and any person acting or purporting to act for any such.

13. In case of any loss or damage to or in connection with goods exceeding in actual value $500, lawful money of the United States, per package, or, in case of goods not shipped in packages, per customary freight unit, the value of the goods shall be deemed to be $500 per package or per unit, on which basis the freight is adjusted and the carrier's liability in any capacity, if any, shall be determined on a value of $500 per package or per customary freight unit, unless the nature of the goods and a valuation higher than $500 shall have been declared in writing by the shipper upon delivery to the carrier and inserted in this bill of lading and extra freight paid if required; and in such case if the actual value of the goods per package or per

customary freight unit shall exceed such declared value, the value shall nevertheless be deemed the declared value and the carrier's liability in any capacity, if any, shall not exceed the declared value. Whenever less than $500 per package or other freight unit, the value of the goods in the calculation and adjustment of claims shall, to avoid uncertainties and difficulties in fixing value, be deemed to be the invoice value, plus freight and insurance if paid, whether any other value be higher or lower.

The Mormaclynx arrived in Brooklyn on Saturday, April 25, 1967. The container, sealed and undamaged, was unloaded by stevedores and was placed in a large terminal area operated by Mooremac's wholly owned subsidiary, Tidewater Terminal, Inc. ("Tidewater") to await pick up by the shipper. The area was accessible through four gates. Two were open 24 hours a day, supposedly under the continuous supervision of watchmen. The other two were open only from 8:00 A.M. to 4:00 P.M. on weekdays and were similarly guarded at those times. At least one roving watchman was on duty to see that there were no unauthorized persons on the pier and that no one opened any container.

Records were kept of all trucks entering and leaving the terminal area.

On Monday, April 27, the shipper's truckman arrived at 9:30 A.M. to pick up the container. It could not be located, although the delivery book at the pier had not been signed. The fence around the area bore no signs of tampering. Next day the police found the container empty, at Freeport, L.I., some 25 miles away. The goods have not been recovered, and the details of the theft have never been reconstructed.

In this suit in admiralty in the District Court for the Eastern District of New York, plaintiff sought damages in the amount of the alleged value of the leather from the ship, Mooremac, and Tidewater. In a thorough opinion, 313 F. Supp. 1373 (1970), Judge Judd held (1) that the defendants had been negligent in their custody of the container; (2) that the 99 bales rather than the single container constituted "packages" for the purposes of paragraph 13 of the bill of lading and § 4(5) of the Carriage of Goods by Sea Act (COGSA);[3] (3) that the limitation of liability to $500 per container was invalid even though the loss occurred after discharge and was therefore governed by the Harter Act[4] rather than COGSA; but (4) that because of the definition of

---

3. Section 4(5), 46 U.S.C. § 1304(5), provides:

> Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. * * *

This must be read in conjunction with § 3(8), 46 U.S.C. § 1303(8), which states:

> Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations

provided in this section, or lessening such liability otherwise than as provided in this chapter shall be null and void and of no effect. * * *

4. The relevant provision, 46 U.S.C. § 190, is:

> It shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect.

"carrier" in clause 2. of the bill of lading to include "all persons rendering service in connection with performance of this contract," the limitation of liability to $500 per bale was available to Tidewater as well as to Mooremac. Accordingly, he rendered judgment for $49,500, together with interest and costs, against all the defendants. They appeal from the holdings numbered (1), (2) and (3); plaintiff appeals from the failure to award full damages, claimed to be $155,192, against Tidewater. We affirm as to Mooremac and the Mormaclynx, but reverse and remand as to Tidewater, without reaching the questions raised on the plaintiff's cross-appeal with respect to the latter.

## I.

The district court was not asked, and evidently saw no need, to examine the jurisdictional underpinnings of this action. Neither has any question in this regard been raised by the parties on this appeal. Nevertheless, the nature of the claims here at issue necessitates such an examination. While this would be required in any event, here, as will be seen, our evaluation of the jurisdictional questions affects our resolution of the merits.

■ The shipper's complaint states this to be an action in admiralty for "contract and cargo damage." The action was brought *in rem* as to the Mormaclynx and *in personam* as to Mooremac and Tidewater. Without doubt, Mooremac was responsible—thus making the Mormaclynx liable in proceedings *in rem* —for the safe delivery of the container under the contract of carriage, *i. e.,* the bill of lading. While the loss of the container occurred after the act of carriage had been completed and the container had been discharged from the Mormaclynx, that does not mean that the contract of carriage, obviously a maritime contract, was at an end; the contract continues to govern the relationship between a shipper and a carrier after discharge but before delivery.[5] Such was our holding in David Crystal, Inc. v. Cunard S.S. Co., 339 F.2d 295, 297 (2 Cir. 1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed. 2d 271 (1965). Consequently, the shipper's claims against Mooremac and the ship for failure to deliver the container in violation of the contract of carriage is properly within federal admiralty jurisdiction. See North American Smelting Co. v. Moller S.S. Co., 204 F.2d 384, 385 & n. 2 (3 Cir. 1953).

■ The district court apparently considered the shipper's claim against Tidewater also to rest upon the contract of carriage. It took the position that there was no need to distinguish between Tidewater and Mooremac, since, in its view, the former was rendering services in connection with the contract of carriage at the time of the loss. But even accepting this view *arguendo*, we fail to perceive how this makes Tidewater a party to the

5. This is not to say that a contract of carriage continues indefinitely after discharge. If a shipper is dilatory in calling for his goods, the relationship between the carrier and the shipper would no longer be governed by the contract of carriage. *Cf.* Carver, Carriage of Goods by Sea 697–98 (1957). In such event, it seems likely that any dispute between the parties would no longer be within the admiralty jurisdiction, their relative rights and duties becoming a matter for the common law. However, we need not decide that question, since here there is no claim of unreasonable delay on the part of the shipper in calling for the container.

In the same vein, while a carrier could not simply disclaim all responsibility for cargo upon discharge from the ship's deck, see § 1 of the Harter Act, 46 U.S.C. § 190, we see no impediment to a carrier and shipper agreeing in the bill of lading that the carrier may fulfill its responsibilities as carrier following discharge by taking such a step as putting the cargo in a public warehouse at the risk and expense of the shipper. Compare David Crystal, Inc. v. Cunard S.S. Co., 339 F.2d 295, 297–298 (2 Cir. 1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965). The bill of lading here essentially provided for this, but Mooremac did not act upon this provision.

contract of carriage and renders it liable for breach of that contract. Tidewater had not signed the bill of lading; it was merely performing the function of caring for the cargo until delivery—a contractual duty owed to the shipper in the first instance by Mooremac. Tidewater's legal status would be most appropriately characterized as that of agent of Mooremac [6]—as well as a bailee of the container.[7] As an agent which was acting within the scope of its authority, it is not liable *ex contractu* for the breach of the contract between its disclosed principal and a third party, even when the breach was the result of its own wrongful act. See Chipman v. Lollar, 304 F.Supp. 440, 445 (N.D. Miss.1969); *cf.* Valkenburg, K.-G. v. The S.S. Henry Denny, 295 F.2d 330, 333 (7th Cir. 1961). See also O'Hagan v. Del Prado, 53 N.Y.S.2d 843 (Sup.Ct. 1945). Consequently, we conclude that with respect to Tidewater, the shipper failed to state any claim in admiralty under the contract of carriage.

 That is not to say, however, that the shipper failed to state any claim whatsoever against Tidewater. Pleadings in admiralty have traditionally been read with liberality. See DuPont de Nemours & Co. v. Vance, 60 U.S. (19 How.) 162, 171–172, 15 L.Ed. 584 (1856); Archawski v. Hanioti, 350 U.S. 532, 534, 76 S.Ct. 617, 100 L.Ed. 676 (1956). The 1966 merger of the admiralty and civil rules of procedure had no adverse impact upon this principle. See F.R.Civ.P. 9(h).

& 8. The heart of the shipper's complaint is that the loss of the container was the result of the negligence of Tidewater. Viewing this allegation with the requisite liberality,[8] we conclude that the shipper stated a valid claim against Tidewater for tortious conduct. But such a claim is not within federal admiralty jurisdiction, as would have been quite obvious if the shipper had sued Tidewater in tort alone. The loss of the container, as well as the associated purported negligence, occurred on land, and it was established as long ago as Justice Story's famous decision in De Lovio v. Boit, 7 Fed.Cas. 418, 444, No. 3776 (C.C.D. Mass. 1815), that admiralty jurisdiction in tort "is necessarily bounded by locality." See also State Industrial Comm'n v. Nordenholt Corp., 259 U.S. 263, 271, 42 S.Ct. 473, 66 L.Ed. 933 (1922); 7A Moore, Federal Practice ¶.325 [3] (2d ed. 1970). There has been no deviation from this principle save by the statute, 46 U.S.C. § 740, not here applicable, for damage "caused by a vessel * * * notwithstanding that such damage or injury be done or consummated on land," and by the Jones Act, 46 U.S.C. § 688, for injuries to a seaman "in the course of his employment." 7A Moore, *supra*, ¶.325 [4], at 3574–75. The shipper's claim against Tidewater for tortious conduct thus is not a maritime claim but a state claim arising under the law of New York.[9]

---

6. An agent is typically one who is acting on behalf of and under the control of another, the principal. See ALI Restatement (Second) of the Law of Agency § 1 (1958). It is clear that Tidewater was acting in behalf of Mooremac. Furthermore, we have little doubt that Mooremac exercised substantial control over its subsidiary Tidewater with regard to the care of cargo at the Brooklyn pier. Consequently, we consider the characterization of Tidewater as an agent entirely appropriate. See ALI Restatement (Second), *supra*, § 14N.

7. As to Tidewater's status as a bailee, see Part II *infra*.

8. In accordance with F.R.Civ.P. 9(h), the shipper's complaint properly invoked admiralty jurisdiction and procedures.

9. In addition, under the rule that a principal is liable for the torts of its agents, the shipper would also very likely have a valid state claim in tort against Mooremac. See, e. g., De Ronde v. Gaytime Shops, Inc., 239 F.2d 735, 738 (2 Cir. 1956); *cf.* Nowack v. Metropolitan Street Ry., 166 N.Y. 433, 438, 60 N.E. 32, 33 (1901). See also ALI Restatement (Second) of the Law of Agency §§ 214 & 215 (1958). Whether the shipper's complaint in this action could be construed to state such a claim is more questionable since the thrust of the complaint

██ This conclusion raises the question whether the district court had jurisdiction with respect to the shipper's claim against Tidewater. In resolving this, we consider it appropriate to look to the doctrine of pendent jurisdiction.[10] We begin with the observation that the question of pendency in this instance hinges exclusively upon the identity of the facts in the state and federal claims, since Tidewater is a named defendant only with respect to the state claim.

██ The question of pendent jurisdiction involves two discrete inquiries: whether the court has the "power" to hear the state claim; and whether, assuming the power, the court should, as a matter of "discretion," hear the state claim. As to the first issue, it is questionable whether this state claim could have been heard under the test of Hurn v. Oursler, 289 U.S. 238, 246, 53 S.Ct. 586, 589, 77 L.Ed. 1148 (1933), which restricted pendent jurisdictions to instances in which "two distinct grounds [one state, one federal] in support of a single cause of action [were] alleged." Joinder of the state claim against Tidewater would doubtless have been considered a second cause of action. But with the decision in United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Court abandoned such an "unnecessarily grudging" approach to the question of power to hear the pendent claim, and turned instead to a mode of analysis which focuses upon the relationship between the facts underlying the state and federal claims:

> The state and federal claims must derive from a common nucleus of operative facts. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

*Id.* at 725, 86 S.Ct. at 1138 (footnote omitted).

To be sure, the *Gibbs* Court was not confronted with the question whether pendent jurisdiction extended to a state claim against a party not named in the federal claim. But as we have recently observed in Astor-Honor, Inc. v. Grosset & Dunlap, Inc., 441 F.2d 627, 629 (2 Cir. 1971), "Mr. Justice Brennan's language and the common sense considerations underlying it seem broad enough to cover that problem also. See Note, UMW v. Gibbs and Pendent Jurisdiction, 81 Harv. L.Rev. 657, 664 (1968)." In that decision, involving federal claims under the copyright laws and state claims of unfair trade practice and unfair competition, including a defendant not named in the copyright claims, we held that a federal court had power to hear a state claim against a party not named in the federal claim, provided the *Gibbs* test was met, noting that this conclusion was buttressed by our decisions concerning ancillary jurisdiction to entertain com-

---

with respect to Mooremac seems only to be breach of the contract of carriage—although we find it unnecessary to decide this in light of our conclusion as to Mooremac's contractual liability, see Part II *infra*.

10. From the pleadings it appears that Leather's Best is a New York corporation while Tidewater is a Delaware corporation. It further appears, however, that Tidewater's "principal place of business" is in the State of New York, which would foreclose the possibility of there being diversity jurisdiction with respect to the state claim. See 28 U.S.C. § 1332(c). In any event, the shipper's complaint failed to plead jurisdiction based upon diversity of citizenship and thus it is impossible to conclude that there is independent federal jurisdiction with respect to the shipper's claim against Tidewater.

On the other hand, the absence from the shipper's complaint of any allegation concerning pendent jurisdiction does not bar consideration of the issue by this court. Pendent jurisdiction is not matter which must be pleaded since the court already has jurisdiction over the case. See F.R. Civ.P. 8(a) (1); 5 Wright & Miller, Federal Practice and Procedure § 1207, at 82 (1969).

pulsory counterclaims under F.R.Civ.P. 13(a), United Artists Corp. v. Masterpiece Productions, Inc., 221 F.2d 213 (2 Cir. 1955), and third-party claims under F.R.Civ.P. 14(a), Dery v. Wyer, 265 F.2d 804 (2 Cir. 1959).

 It is true that in those cases, as well as in *Astor-Honor*, the federal claim had arisen in the ordinary civil jurisdiction, whereas the federal claim in this action had been brought under the admiralty jurisdiction. At an earlier date, this difference might have affected our decision here. But the rules of procedure in the admiralty and civil jurisdictions were merged in 1966, and we are of the opinion that at least since that merger, the constitutional rationale which underlies the doctrine of ancillary jurisdiction in the context of Rule 13 (a) [11] and Rule 14 [12] may be applied to

11. Prior to the 1966 merger, there was no rule of compulsory counterclaim, much less a doctrine of ancillary jurisdiction, in the maritime jurisdiction, and permissive cross-libels were limited to claims in admiralty arising out of the same contract or cause of action as the original claim. Compare United States v. Isthmian S.S. Co., 359 U.S. 314, 320–323, 79 S.Ct. 857, 3 L.Ed.2d 845 (1959); Moore-McCormack Lines, Inc. v. McMahon, 235 F.2d 142 (2 Cir. 1956). With merger, however, Rule 13 became applicable to proceedings brought in the admiralty jurisdiction. See United States v. M/V Pitcairn, 272 F.Supp. 518, 519 (E.D. La.1967); *cf.* Upper Lakes Shipping, Ltd. v. International Longshoremen's Ass'n, 293 F.Supp. 207, 208 (S.D.N.Y. 1968). There is no evident reason why the doctrine of ancillary jurisdiction should not now be applicable as well to compulsory counterclaims which arise in the context of suits in admiralty. See United States v. Shafter, 49 F.R.D. 164, 167–168 (S.D.N.Y.1969), aff'd on other grounds, 424 F.2d 281 (2 Cir.), cert. denied Kilarjan v. United States, 400 U.S. 827, 91 S.Ct. 54, 27 L.Ed.2d 57 (1970).

12. With respect to third-party practice, too, admiralty practice differed from practice on the civil "side" prior to the 1966 merger. Under former Admiralty Rule 56, at least some independent basis of federal jurisdiction was always necessary to implead a third party. See 3 Moore, Federal Practice ¶ 14.20, at 669 (1970); 6 Wright & Miller, Federal Practice and Procedure § 1465, at 348–49 (1971). Indeed, there was substantial authority to the effect that the third-party claim had to come within the *admiralty* jurisdiction. See Aktieselskabet Fido v. Lloyd Braziliero, 283 F. 62, 72 (2 Cir.), cert. denied, 260 U.S. 737, 43 S.Ct. 97, 67 L.Ed. 489 (1922); Rudy-Patrick Seed Co. v. Kokusai, 1 F.Supp. 266 (S.D.N.Y. 1932). But *cf.* Soderberg v. Atlantic Lighterage Corp., 19 F.2d 286, 287 (2 Cir.), cert. denied, 275 U.S. 542, 48 S.Ct. 37, 72 L.Ed. 416 (1927). With merger, a subsection (c) was added to Rule 14 with the intent of preserving certain features of admiralty impleader which were more liberal than civil impleader. See Colby, Admiralty Unification, 54 Geo.L.J. 1258, 1272–73 (1966). The effect of merger upon the former admiralty requirement of independent jurisdiction for impleader has not as yet been conclusively resolved. Compare Gambino v. United Fruit Co., 48 F.R.D. 28 (S.D.N.Y. 1969), with Young v. United States, 272 F.Supp. 738, 742–743 (D.S.C. 1967), and McCann v. Falgout Boat Co., 44 F.R.D. 34 (S.D. Tex. 1968). See also Watz v. Zapata Off-Shore Co., 431 F.2d 100, 117–118 (5 Cir. 1970). But if we were presented with the question, it would be only with the greatest reluctance that we would conclude that under the merged rules the doctrine of ancillary jurisdiction did not extend to admiralty as well as to civil impleader. Compare 6 Wright & Miller, *supra*, § 1465, at 348–49. Certainly the practical considerations which support the doctrine of ancillary jurisdiction in the context of civil impleader are equally persuasive on the admiralty side. Compare Dery v. Wyer, *supra*, 265 F.2d at 806–807. In any event, we do not perceive the requirement of independent jurisdiction in pre-merger admiralty impleader to have had constitutional underpinnings. Rather it reflected a judicial conception of the limited nature of Admiralty Rule 56 and the appropriate reach of the then distinct admiralty jurisdiction. Compare Aktieselskabet Fido v. Lloyd Braziliero, 283 F. 62, 72–73 (2 Cir.), cert. denied, 260 U.S. 737, 43 S.Ct. 97, 67 L.Ed. 489 (1922); The Goyaz, 281 F. 259, 260–261 (S.D.N.Y. 1922), aff'd, 3 F.2d 553 (2 Cir.), cert. denied, 267 U.S. 594, 45 S.Ct. 230, 69 L.Ed. 804 (1924); Lamborn & Co. v. Compania Maritima Del Nervion, 19 F.2d 155, 156 (2 Cir. 1927); Rudy-Patrick Seed Co. v. Kokusai, 1 F.Supp. 266 (S.D.N.Y. 1932).

support the conclusion that a federal court has the power to hear a related state claim against a defendant not named in the federal claim regardless of whether the federal claim arises in the civil or admiralty jurisdiction. Thus, we conclude that in a case such as this, where the facts underlying the state and federal claims are identical,[13] a federal court vested with admiralty jurisdiction over a shipper's claim against the carrier for breach of contract of carriage does have the "power" also to entertain its state tort claim against a pier operator.[14]

There remains, though, the further question whether this is an appropriate case for the court, in the exercise of its discretion, to hear the pendent claim. In this regard, the Supreme Court has indicated that the justification for the exercise of pendent jurisdiction "lies in the considerations of judicial economy, convenience and fairness to litigants." United Mine Workers v. Gibbs, *supra,* 383 U.S. at 726, 86 S.Ct. at 1139. In this case, the same facts are ultimately controlling with respect to both the state and federal claims; the desirability of having both claims tried in the same forum is self-evident. Moreover, while our conclusions in part II require us to remand the state claim for further proceedings, the evidentiary record compiled in the original proceeding will continue to be of substantial relevance, and we thus see no basis for declining jurisdiction over the state claim at this juncture.

## II.

With the jurisdictional problem thus resolved, we turn to the liability of Mooremac and Tidewater for the loss of the container. Although the contract of carriage continued in effect after the cargo had been discharged, it failed to specify the precise responsibilities of the carrier with respect to the container during that period. Thus, we are presented with a situation essentially analogous to that in David Crystal, Inc. v. Cunard S.S. Co., *supra,* 339 F.2d at 298. We see no basis for departing from

To the extent that any possible constitutional considerations influenced judicial limitation of admiralty impleader, a major factor appears to have been concern with the denial of the jury trial right guaranteed by the Seventh Amendment. See The Goyaz, 281 F. 259, 261 (S.D. N.Y. 1922). This was, of course, a serious problem prior to the merger of the admiralty and civil jurisdictions. Nor has the problem been clearly resolved by the mere fact of merger. See F.R.Civ.P. 38 (e). Compare McCann v. Falgout Boat Co., 44 F.R.D. 34, 44 (S.D. Tex. 1968), with 6 Wright & Miller, Federal Practice and Procedure § 1465, at 350–52. However, insofar as third-party practice has relevance to the question of pendent jurisdiction in this case, we are not faced with any problem of denial of the right to jury trial since Tidewater made no such demand below. See F.R.Civ.P. 38(d).

In sum, then, we find the constitutional judgments reflected in the doctrine of ancillary jurisdiction in civil impleader to be of substantial relevance to the issue of pendent jurisdiction in this case.

13. The liability of the carrier under the contract of carriage turns ultimately upon the conduct of Tidewater which had charge of the container at the time of the loss. See Part II, *infra.*

14. We do not regard certain decisions in which unsuccessful attempts have been made to join state claims against individual defendants, without diversity, in actions against the United States under the Federal Tort Claims Act for the same injury as opposed to our conclusion here. See Wasserman v. Perugini, 173 F.2d 305, 306 (2 Cir. 1949); Williams v. United States, 405 F.2d 951, 955 (9 Cir. 1969). *Wasserman* was a pre-*Gibbs* decision, and as we observed in Astor-Honor, Inc. v. Grosset & Dunlap, Inc., *supra,* 441 F.2d at 629, consequently is of little precedential value. As for *Williams,* we read that decision as not having reached the question whether the court had the "power" to hear the state claim in light of *Gibbs,* but rather to have declined as a matter of discretion to exercise jurisdiction over the state claims because the federal claim had been dismissed prior to trial. 405 F.2d at 955. In any case, we observed in .Astor-Honor, *supra,* 441 F.2d at 630, that "we are not at all sure we would agree with [the *Williams* decision] insofar as [it] rested on a general theory of lack of power."

our decision there that, upon landing the cargo, the carrier assumed the status of bailee and continued to occupy that status, remaining liable for the cargo's safe delivery, regardless into whose hands it placed the cargo, unless it terminated its liability by placing the cargo in a public dock or warehouse in accordance with the bill of lading. *Id.* Thus, although the container was in possession of Tidewater at the time the loss occurred, we have no doubt that for purposes of determining Mooremac's liability, it stands in the shoes of the agent it utilized to perform its obligations, the negligence of the agent being imputed to the principal. See ALI Restatement (Second) of the Law of Agency §§ 214 & 251 (1958).

 Since this is a suit within the admiralty jurisdiction, the standard for judging Mooremac's liability is a matter of federal law. It is common ground that Mooremac, as bailee responsible for the container under the contract of carriage, is liable for the loss of the container as a result of negligence and that a bailor makes out a *prima facie* case of negligence merely by showing delivery of the goods to the bailee and failure to return at the required time. R. Brown, Personal Property § 87, at 363 (1955). Under federal law, though, this does not mean that the burden of persuasion shifts from bailor to bailee. See Southern Ry. v. Prescott, 240 U.S. 632, 640, 36 S.Ct. 469, 60 L.Ed. 836 (1916); Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 110–111, 62 S.Ct. 156, 86 L.Ed. 89 (1941); Kohlsaat v. Parkersburg & Marietta Sand Co., 266 F. 283, 284–285 (4th Cir. 1920). It is only the burden of production that shifts once the bailor has made the requisite *prima facie* showing. Just what this means was developed in Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. at 110–111, 62 S.Ct. at 161, where the Court said (citations omitted):

> The burden of proof in litigation, wherever the law has placed it, does not shift with the evidence, and in determining whether petitioner has sustained the burden the question often

is, as in this case, what inferences of fact he may summon to his aid. In answering it in this, as in others where breach of duty is the issue, the law takes into account the relative opportunity of the parties to know the fact in issue and to account for the loss which it is alleged is due to the breach. Since the bailee in general is in a better position than the bailor to know the cause of the loss and to show that it was one not involving the bailee's liability, the law lays on him the duty to come forward with the information available to him. * * * If the bailee fails, it leaves the trier of fact free to draw an inference unfavorable to him upon the bailor's establishing the unexplained failure to deliver the goods safely. * * *

> Whether we label this permissible inference with the equivocal term "presumption" or consider merely that it is a rational inference from the facts proven, it does no more than require the bailee, if he would avoid the inference to go forward with evidence sufficient to persuade that the nonexistence of the fact, which would otherwise be inferred, is as probable as its existence. It does not cause the burden of proof to shift, and if the bailee does go forward with evidence enough to raise doubts as to the validity of the inference, which the trier of fact is unable to resolve, the bailor does not sustain the burden of persuasion which upon the whole evidence remains upon him, where it rested at the start. * * *

Another useful statement is that for the bailee to rebut the bailor's *prima facie* case

> [h]e may show either how the disaster in fact occurred and that this was in no way attributable to his negligence, or that he exercised the requisite care in all that he did with respect to the bailed article so that, regardless of how the accident in fact transpired, it could not have been caused by any negligence on his part. * * *

Richmond Sand & Gravel Corp. v. Tidewater Const. Corp., 170 F.2d 392, 393–394 (4th Cir. 1948). See also Sisung v. Tiger Pass Shipyard Co., 303 F.2d 318, 321–322 (5th Cir. 1962).

■ In reviewing the district court's determination of negligence, the established rule in this circuit is that a judge's conclusion with respect to negligence is not a "finding of fact" protected by the "unless clearly erroneous" provision of F.R.Civ.P. 52(a), but that "it will ordinarily stand unless the lower court manifests an incorrect conception of the applicable law." Cleary v. United States Lines Co., 411 F.2d 1009, 1010 (2 Cir. 1969). While Judge Hough's opinion in Evans v. New York & P.S.S. Co., Ltd., 163 F. 405 (S.D.N.Y. 1906), from which the district judge quoted, may have been based on state rather than federal bailment law, we find nothing in that opinion inconsistent with the present federal rule that, on the one hand, the burden of persuasion remains throughout with the bailor, but that, on the other, the burden of production is on the bailee to show his freedom from negligence in connection with the loss of the bailed property by whatever cause in order to meet the bailor's *prima facie* case. In short, nothing in the district judge's opinion in this case indicates that he applied a legal standard erroneous under federal law in determining the carrier's liability.

■ As to the evidence in the record, while we would scarcely have disturbed a conclusion that Mooremac was not liable for negligent loss of the cargo, we likewise see no sufficient basis for upsetting the conclusion that it was. The mere facts that the evidence points strongly to theft and that defendant's agent had taken considerable precautions do not preclude a conclusion of negligence on the part of the agent under federal law. None of Tidewater's gatemen was called to testify; no evidence was offered to rebut what seems to be, in light of all the facts, the very substantial possibility that a gateman was derelict in the performance of his duties—either by abandoning or sleeping at his post for a time. In sum, Mooremac showed neither that the possible theft was "in no way attributable to [Tidewater's] negligence" nor that Tidewater had exercised such a degree of care in guarding the container that the loss could not have been due to its negligence regardless of how the container was removed from the storage area.[15]

■ The liability of Tidewater for its allegedly tortious conduct is a different matter. Under applicable state law, Tidewater, while an agent engaged in fulfilling Mooremac's obligations following discharge of the container, apparently occupied as well the status of a bailee with respect to the shipper. See Berger v. 34th Street Garage, Inc., 274 App.Div. 414, 418–420, 84 N.Y.S.2d 348, 351–353 (1948); Leland Wine & Liquor Store, Inc. v. Midtown Warehouse, Inc., 181 Misc. 106, 42 N.Y.S.2d 9 (1943); *cf.* Howard v. Finnegans Warehouse Corp., 33 A.D.2d 1090, 307 N.Y.S.2d 1022 (1970). As under federal law, the shipper made a *prima facie* case of negligence by showing a failure to deliver the container upon demand. See, e. g., Jay Howard, Inc. v. Rothschild, 16 A.D.2d 628, 226 N.Y.S.2d 769 (1962); Textile Overseas Corp. v. Riveredge Warehouse Corp., 275 App.Div. 236, 88 N.Y.S.2d 429 (1949). Under New York law, too, it is only the burden of production that shifts from the bailor to the bailee; the burden of persuasion remains always on the

15. We are not certain that the decision of a divided court in North American Smelting Co. v. Moller S.S. Co., 204 F.2d 384 (3 Cir. 1953), on which Mooremac relies, is to the contrary; in that case the majority reversed a district court's finding of negligence based on failure of the carrier to furnish a special guard while the cargo was on a pier which was otherwise guarded by the pier operator. Thus, the Court of Appeals arguably determined merely that the exercise of due care by the carrier did not require furnishing a special guard in light of the security measures taken by the pier operator. In any event, the court characterized the question as simply one of negligence rather than as one of negligence in the context of a bailment, and if the decision is not distinguishable, we respectfully disagree with it.

bailor. See, e. g., Fidelity & Guaranty Ins. Corp. v. Ballon, 280 App.Div. 373, 113 N.Y.S.2d 546 (1952); Roy Bros., Inc. v. Dana, 52 Misc.2d 355, 275 N.Y.S. 2d 406, 408 (Civ.Ct. 1966). However, that is where the similarities between state and federal law in this case end. In cases of loss due to theft, New York requires the bailee to establish only the fact of theft in order to meet the bailor's *prima facie* case. The bailee is not required to go on to show that the theft was not the result of its negligence; rather it is for the bailor to demonstrate negligence on the part of the bailee in the context of loss by theft. See Claflin v. Meyer, 75 N.Y. 260, 264 (1878); Procter & Gamble Distributing Co. v. Lawrence American Field Warehousing Corp., 16 N.Y.2d 344, 358–359, 266 N.Y.S. 2d 785, 796–797, 213 N.E.2d 873 (1965); Jay Howard, Inc. v. Rothschild, 16 A.D. 2d 628, 226 N.Y.S.2d 769 (1962).

■ In light of this, the district court's determination of negligence with respect to Tidewater's personal liability cannot stand. See Cleary v. United States Lines Co., *supra,* 411 F.2d at 1010. The only evidence introduced by the shipper on the question of Tidewater's negligence went to the initial question of the failure to deliver the container. The bailee responded with substantial evidence pointing strongly to theft and detailing its procedure for guarding cargo. While the showing made by the defendants was not necessarily sufficient to absolve the carrier of liability for negligence under the strict federal rule, it seems clear that the shipper did not meet its burden of proof as to Tidewater under the state rule. Substantial evidence suggesting theft having been presented, the shipper failed to come forward with evidence concerning possible negligence of Tidewater in connection with the theft. On the record before us, we find it impossible to sustain the finding of negligence with respect to the claim against Tidewater.

At the same time, we cannot conclusively say that Tidewater was not negligent under state law. The failure of the bailor to offer detailed proof of negligence is explainable by the evident misimpression in the district court that the same law applied to each defendant. Had the parties been aware of the nature of their respective burdens of proof on the various claims, the bailor might well have come forward with further evidence. Consequently, we conclude that fairness to both parties requires us to reverse the finding of negligence with respect to Tidewater but to remand this claim for further proceedings in light of what has been said here.

### III.

■ We thus reach the issue of the extent of Mooremac's liability—more specifically, of the validity of the limitation to $500 per container.

This is by no means the first case in which this court has been confronted with the question what constitutes a "package" within § 4(5) of COGSA, 46 U.S.C. § 1304(5), and it will hardly be the last. The purpose of the provision, as stated by Chief Judge Lumbard in Standard Electrica, S.A. v. Hamburg Sudamerikanische Damperchifffahrts-Gesellschaft, 375 F.2d 943, 945 (2 Cir.), cert. denied, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967) (footnote omitted), was doubtless to describe "a unit that would be fairly uniform and predictable in size, and one that would provide a common sense standard so that the parties could easily ascertain at the time of contract when additional coverage was needed, place the risk of additional loss upon one or the other, and thus avoid the pain of litigation." The difficulty presented in this case, as in that one, is that "[f]ew, if any, in 1936 could have foreseen the change in the optimum size of shipping units that has arisen as the result of technological advances in the transportation industry." *Id.* The problem demands a solution better than the courts can afford, preferably on an international scale, and diplomatic discussions have been initiated to that end. See Schmeltzer & Peavy, Prospects and Problems of the Container Revolution, 1 J.

Maritime L. & Commerce 203, 223–225 (1970). Meanwhile the courts must wrestle with a statutory provision that has become ill-suited to present conditions.

Defendants place great reliance on the decision of a divided court in *Standard Electrica,* from which we have quoted, holding that where a shipper had made up nine pallets each containing six cardboard cartons of television timers, the pallet rather than the *cartons* constituted the "package." [16] However, several factors distinguish *Standard Electrica* from this case. The pallets were nothing like the size of the container here; they had been made up by the shipper; and the "dock receipt, the bill of lading, and libellant's claim letter all indicated that the parties regarded each pallet as a package." 375 F.2d at 946. Indeed, there seems to have been nothing in the shipping documents in that case that gave the carrier any notice of the number of cartons.

We recognize that this distinction is not altogether satisfactory; it leaves open, for example, what the result would be if Freudenberg had packed the bales in a container already on its premises and the bill of lading had given no information with respect to the number of bales.[17] There is a good deal in Judge Hays' point in his dissent in the *Encyclopaedia Britannica* case, see fn. 16, "that considering the containers as the packages promotes uniformity and predictability," at least where it contains goods of a single shipper. It is true also that the standard arguments about the economic power of the carrier and the weak bargaining position of the consignor may be simply a recitation of an ancient shibboleth, at least as applied to shipments of containers fully packed by the shipper. The shipper insures for any value in excess of the limitation (or perhaps for the whole value) and, for all we know, a ruling that each bale constituted a "package" may simply be conferring a windfall on the cargo insurer, admittedly the true plaintiff here, if it based its premium on the assumption that Mooremac's liability was limited to $500.[18] Still we cannot escape the belief that the purpose of § 4(5) of COGSA was to set a reasonable figure below which the carrier should not be permitted to limit his liability and that "package" is thus more sensibly related to the unit in which the shipper packed the goods and described them than to a large metal object, functionally a part of the ship, in which the carrier caused them to be "contained." [19] We therefore hold that,

16. They also rely on Judge Hays' dissenting opinion in Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer, 422 F.2d 7, 20 (2 Cir. 1969), cert. denied, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970), holding that part of a shipment described in the bill of lading as "one metal container * * * said to contain: 536 ctns. bound books," constituted a single package. The majority in that case did not reach this issue.

17. The brief of United States Lines as *amicus curiae* contains a sample bill of lading which describes the shipment as "one container" and recites the number of "packages" as "one."

18. United States Lines calls our attention to comments of Lord Diplock concerning the conferences called to revise the Hague Rules wherein his lordship expressed the hope that "any proposal to solve the anomaly arising from the package limitation in the Hague Rules * * * will

be based on the practical economics of insurance and not on any high moral grounds" and the belief that "it is more practical and economical from the point of view of insurance to spread the risk to the cargo in excess of a fixed limit among a number of cargo insurers rather than to concentrate it in the carrier's [protection and indemnity] insurer." Diplock, Conventions and Morals—Limitation Clauses in International Maritime Conventions, 1 J. Maritime L. & Commerce, 525, 536, 528–29 (1970). This still does not answer the question what the appropriate "fixed limit" should be. In any event, we must take COGSA as Congress passed it.

19. The shipper here received a discount of 10% from the otherwise applicable tariff for services in loading and unloading the container. However, there is nothing to show that the carrier did not realize corresponding economic advantages for the

under the circumstances of this case, the legend in the lower-left hand corner of the bill of lading was an invalid limitation of liability under COGSA.

## IV.

However, this does not inevitably lead to the conclusion that the limitation was invalid as applied to a loss after the cargo had been landed.

■ The framers of COGSA were at considerable pains to make clear that it applies only to "the carriage of goods by sea to or from ports of the United States, in foreign trade." 46 U.S.C. § 1300 (enacting clause). Section 1(e) defines "carriage of goods" as covering "the period from the time when the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C. § 1301 (e). Section 12 leaves the issue of liability for the period prior to loading or after discharge to the Harter Act, 46 U.S.C. § 1311, see fn. 4, or any other relevant legislation.

If Mooremac had said simply that liability before loading or after discharge would be limited to $500 per container unless a higher valuation were declared and a higher rate paid, such a stipulation would have effectively limited its liability for the loss that here occurred. The Ansaldo San Giorgio I v. Rheinstrom Bros. Co., 294 U.S. 494, 496–497, 55 S.Ct. 483, 79 L.Ed. 1016 (1935). However, plaintiff claims, and the district court held, that a different result was compelled here because the limitation was void as applied to the carriage covered by COGSA and, as we said in *David Crystal, supra,* 339 F.2d at 299, "[i]t would be unfair to permit the void clause to spring to life once the goods reached land, for by then Crystal had justifiably relied on the clause's inapplicability in

making its decision on adequate cargo insurance."

Defendants suggest various bases for distinguishing *David Crystal*. They say that, in contrast to the bill of lading there at issue, clause 1 of the instant bill of lading apprised the shipper that where COGSA did not apply by its own force, the carrier was covered by all limitations stated elsewhere therein, and thus the $500 limitation clause for the entire container should be given effect after discharge. They point out that the limitation sought to be effected by the bill of lading in *David Crystal* was £20 per package, which was inadmissible under any possible reading of COGSA and, indeed, as the court said, "such an arbitrarily small sum that it should be void as contrary to public policy," 339 F.2d at 299. But all this shows is that *David Crystal* was a stronger case for holding the limitation invalid after landing than this one.[20] The basic thrust of that decision is that if a carrier inserts a limitation of liability clause in the bill of lading which puts the shipper to the alternative of either paying for more insurance on the movement by sea than COGSA contemplates or foregoing such insurance on the basis of his belief in the clause's unenforceability, the carrier cannot avail himself of the limitation after the goods are landed. The mere fact that it now turns out that a shipper able to foresee this court's decision could have protected himself by insuring for the excess over $500 per bale during the sea movement and over $500 per container during the prior and subsequent periods does not save the limitation during the latter periods. We see nothing in Pannell v. United States Lines Co., 263 F.2d 497 (2 Cir.), cert denied, 359 U.S. 1013, 79 S.Ct. 1151, 3 L.Ed.2d 1037 (1959), that assists the defendants on this point.

container method of shipment; to the contrary, the district court was of the view that containers are "primarily for the convenience of the carrier, since they cut down handling time and can save as much as 90% of the time required for unloading and reloading a vessel." 313 F.Supp. at 1376.

20. One other consideration noted in *David Crystal, supra,* 339 F.2d at 299, that "the limitation provision in the bill of lading does not explicitly cover post-arrival damage" seems fully applicable in this case.

J. Aron & Co. v. The Askvin, 267 F.2d 276 (2 Cir. 1959), which was not cited to us in *David Crystal* or referred to in that opinion, is more troublesome. There a one year limitation on suit in the bill of lading, so worded as to be invalid under COGSA since it required actual service of process and not merely the filing of suit within that time, was upheld as to a suit for damage occurring to the cargo after discharge and before delivery; the court deemed that the Harter Act controlled during the period in question and found that the limitation was reasonable under that Act. The difference would seem to be that a limitation of liability invalid under COGSA affects the conduct of the shipper before the accident by causing him either to take out more insurance than the statute contemplated or to forego such insurance on the basis of the clause's invalidity, whereas the decision as to when suit must be brought is made after the loss, with full opportunity to obtain the advice of counsel. If this distinction should be regarded as less than completely satisfying, as it may well be, the case to be reconsidered is *J. Aron* rather than *David Crystal*.

### V.

■ This brings us to the shipper's cross-appeal. The district court applied the $500 per bale limitation to Tidewater on the ground that "Tidewater was only an instrumentality for performing the carrier's duty and therefore was 'rendering services in connection with the performance of this contract'" under clause 2 of the bill of lading. Plaintiff attacks this conclusion on a number of grounds, notably this court's decision in Cabot Corp. v. S.S. Mormacscan, 441 F.2d 476 (2 Cir.), cert. denied, 404 U.S. 855, 92 S.Ct. 104, 30 L.Ed.2d 96 (1971). While we find it unnecessary now to decide these questions in light of our remand of the shipper's claim against Tidewater, we do note with interest the apparent New York rule, applicable in the context of bailments, that an agent acting within the scope of its authority is entitled to the benefit of any contractual

limits upon the liability of its principal. See e. g., Berger v. 34th Street Garage, Inc., 3 N.Y.2d 701, 171 N.Y.S.2d 824, 148 N.E.2d 883 (1958); Howard v. Finnegans Warehouse Corp., 33 A.D.2d 1090, 307 N.Y.S.2d 1022 (1970). We express no views at this juncture as to the precise effect of that rule in the context of this case.

———

On the defendants' appeals, the judgment is affirmed with respect to Mooremac and the Mormaclynx, and reversed and remanded with respect to Tidewater; we do not reach the questions raised on the plaintiff's cross-appeal. Plaintiff may recover half its costs against Mooremac and the Mormaclynx. Costs with respect to Tidewater shall abide the event.

MULLIGAN, Circuit Judge (dissenting in part):

I respectfully dissent only from Part IV of this scholarly opinion. I agree that the $500 limitation on the face of the bill of lading is invalid while the cargo is on board and COGSA is applicable. However, I cannot agree that its invalidity persists after the cargo has been unloaded from the ship. There is no dispute that COGSA is applicable only from the time the goods are loaded to the time when they are discharged, 46 U.S.C. § 1301(e). It is also agreed and COGSA provides (46 U.S.C. § 1311) that after the cargo is discharged the duties, responsibilities and liabilities of the ship or carrier are to be governed by the Harter Act (46 U.S.C. §§ 190–196). It is further undisputed that the Harter Act permits a contractual limitation of liability such as that on the face of this bill which gives the shipper the option to declare a higher valuation and to pay higher freight. If all of this is agreed and understood, by what legal legerdemain is the limitation on this bill which is valid under the applicable statute, found to be invalid?

The majority opinion relies on the decision of this court in David Crystal, Inc. v. Cunard Steamship Co., Inc., 339

F.2d 295 (2d Cir. 1964), cert. denied, John T. Clark and Son v. Cunard S.S. Co., 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed. 2d 271 (1965) which held that since the liability limitation in that bill was void under COGSA "it should remain void forever" (339 F.2d at 298–299). This is not at all persuasive. Concededly the limitation is invalid while the container was on board ship but it was not offensive once the container was ashore. The Congress has meticulously defined the jurisdictional bounds of each statute and I do not see how we can disregard this by the incantation of the once void, forever void formula of *Crystal*. The suggestion that it is unfair since the shipper relied on the inapplicability of the clause in making its decision on adequate cargo insurance, (339 F.2d at 299) is not realistic. The shipper in this case had no basis to rely on the definition of a package under COGSA, unless we attribute to him the ability to foresee the precedential decision of this court. What he more realistically relied upon is the explicit bold face language of the lower left hand corner of the bill which limited the carrier's liability to $500 "with respect to entire contents of each container." This is specific and unambiguous and would be controlling over the small print boiler plate of the bill. Pannell v. United States Lines, 263 F.2d 497 (2d Cir.), cert. denied, 359 U.S. 1013, 79 S.Ct. 1151, 3 L.Ed.2d 1037 (1959).

We think J. Aron v. The Askvin, 267 F.2d 276 (2d Cir. 1959) should control here. There the bill of lading, as in this case, incorporated COGSA and also contained a specific statute of limitations that was more restrictive than the COGSA provision. The issue was which limitation provision would apply to a shipper's claim for a loss of cargo which occurred after discharge and before delivery. This court found that the specific language of the bill controlled the general language of COGSA and that the limitation was valid under the applicable Harter Act. In that case the shipper had no alternative but to adhere to the specific language of the limitation.

In the present case the shipper at least had the option of declaring a higher valuation and paying more freight. This he deliberately failed to do and I am not conscious of any unfairness in limiting his recovery. In *J. Aron* this court totally barred the recovery.

The fact *J. Aron* was not cited to the court in *David Crystal* is interesting but not significant. If this court were limited in its decision to cases and authorities cited to us, the landmark opinion of Chief Judge Friendly in this case would never have been written.