Van Voorhis, J.
This is an action against a warehouse corporation based upon the nondelivery of the merchandise for which it issued its warehouse receipts. The theory of action is conversion. Plaintiff (hereafter called P & G) asserts that in the absence of any explanation of the disappearance of these goods, the defendant (hereafter called Field) is liable for the market value of this merchandise at the times when it was delivered to the warehouse. Plaintiff is correct in these contentions, we have concluded, and is entitled to summary judgment in this amount. We agree with the Appellate Division that no triable issue is presented concerning the liability of defendant, but consider that the Appellate Division erred in directing an assessment of damages and in not awarding to plaintiff the undisputed market value of the merchandise delivered to defendant at the times of its delivery, which was as high as at any subsequent time or times prior to notification to plaintiff of its disappearance. The basic issue is simple, but it has been encrusted with a complex of fact and legal argument which makes it necessary to discuss the case in more detail.
Allied Crude Vegetable Oil Refining Corp. (hereafter called Allied) is not a party to this action, but this cause of action against defendant arose through a course of dealings between plaintiff and Allied, which traded in vegetable oils manufactured by various producers including plaintiff. Originally plaintiff sold such merchandise outright on sight draft with bill of lading attached. In the early Fall of 1962, however, in order more fully to utilize its working capital, Allied persuaded plaintiff to engage in a practice known as field warehousing. Allied had leased oil storage tanks at Bayonne, New Jersey, formerly owned by Tide *351 water Associated Oil Company. These were sublet to Field, a wholly OAvned subsidiary of American Express Company (hereafter called Amexco), which thereupon operated as an independent warehouse company. When Allied purchased vegetable oils from plaintiff, and other producers, as it did f. o. b. seller’s plant or warehouse, Bayonne, New Jersey, the oil would be shipped to Bayonne to the seller’s order, and stored for the seller’s account in Field’s warehouses. Doavu payments were made, described in the contract as “Margin Requirements on Consigned Shipments ”, amounting to about 20% of the purchase price, at the time of receipt of the oil at Field’s warehouse, and the balance by sight draft with bill of lading attached, or cash in advance of shipment to buyer, as Allied disposed of the oil.
In accordance with this procedure, plaintiff shipped 9,206,740 pounds of fully refined soybean oil under bills of lading to plaintiff itself as consignee at Bayonne, New Jersey, which was delivered for storage and safe keeping to Field at said warehouse for plaintiff’s account. Field, the defendant, issued five warehouse receipts for this oil dated March 22, April 1 and April 9,1963. Each warehouse receipt recited the number of the bill of lading for the tank car in which it had been contained, amounting in total to 151 tank carloads. Not only was the presence of this oil in defendant’s tanks attested by these nonnegotiable receipts issued in plaintiff’s name, but also by a series of month-end statements issued by defendant indicating that the oil was in the warehouse. Both the warehouse receipts and these month-end statements, based on defendant’s books, are evidence that the oil was received by defendant at its tank warehouse in Bayonne, New Jersey. In the absence of any evidentiary facts showing that defendant did not receive the oil in suit, its warehouse receipts, month-end statements and books of account are conclusive against defendant on this point. Mere suspicion that the oil was stolen before reaching defendant’s tanks is not sufficient to overcome this documentary evidence.
Neither is there any triable issue concerning the market value of edible oil of this quality at the times when it was received by defendant during March and April, 1963. It is undisputed that the market price of this commodity is fixed by frequent transactions between processors and their customers, and that on these delivery dates it was never less than the prices shown in the *352 warehouse receipts which represented the $1,013,075.12 selling price agreed upon between plaintiff and Allied. Defendant could easily have controverted this statement of market value contained in the moving affidavit of plaintiff’s sales assistant, but did not do so. Instead, defendant contends that the damage to plaintiff should be diminished by the market value of the oil at a later date, after the market had broken when the disappearance of this and other oil had come to public attention. The usual measure of damage, in event of nondelivery of goods by a bailee, is the market value on the date of the conversion (McIntyre v. Whitney, 139 App. Div. 557, affd. 201 N. Y. 526; Corn Exch. Bank v. Peabody, 111 App. Div. 553), not the date when the bailor learns of the loss or presents his warehouse receipt and demands his merchandise. Where, as here, the date of the conversion has not been identified, the Appellate Division has held that the value should be fixed as of the date when the bailor received notice of the loss. This, we think, was error. The circumstances regarding the loss of bailed property are more likely to be known by the bailee than by the bailor, and, where the time and manner of the loss is unknown, it ought not to lie in the power of the bailee to choose the date for determining market value by electing when to notify the bailor that the goods have disappeared and cannot be accounted for. The rule that the loss is to be measured as of the time of the conversion, when the conversion date is known, should not be reshaped to designate the date when the bailor is notified of the conversion if the conversion date is unknown. That would place the bailee in a better legal position by pleading ignorance of the circumstances of the loss than if he knew or revealed the circumstances.
This rule should not be applied to the advantage of the warehouseman and the detriment of the bailor if the warehouseman pleads ignorance of the date on which the property disappeared. In order that a bailee may not be permitted to take advantage of his own wrong where the subject of the bailment has been negligently lost or misappropriated, it follows that the bailor should be awarded damages measured by the highest value of the property between the date when the bailment commenced and the date when the bailor has received notice that the property has been lost (Lamb v. O’Reilly, 13 Misc. 212). There appears to be no New Jersey statute directly upon the point, nor is there any *353 thing to indicate that the New Jersey case law differs from our own (Gaines v. Jacobsen, 308 N. Y. 218). The affidavits show that the market value of this vegetable oil fluctuated little until soon before Allied went into bankruptcy. No contention is made that its market value went substantially higher after the dates of plaintiff’s warehouse receipts, and its market value is claimed as of those dates. Consequently there is no need for an assessment of damages inasmuch as the market value of the merchandise entrusted by plaintiff to defendant has been established on the crucial date without contradiction.
Defendant has been credited by the Appellate Division with $217,279.66 on plaintiff’s claim of $1,013,075.12 by reason of the down payments (called margin requirements) in the contracts made by Allied to plaintiff at the times when the oil was deposited in defendant’s tank warehouse. This sum was to have been applied on the purchase price to have been paid by Allied in full at the time of delivery of the oil to it or its order by plaintiff. Allied defaulted in its performance of these contracts by reason of its intervening bankruptcy. Whoever owns this $217,279.66 down payment, it does not belong to Field. It belongs either to plaintiff or to Allied or parts of it to each. Consequently Field is not entitled to be credited with this sum in reduction of its liability to plaintiff for nondelivery of the oil to which plaintiff was entitled under its warehouse receipts. Allied is not a party to this action, therefore it cannot be decided in this action how much of the $217,279.66 belongs to the trustee in bankruptcy of Allied or to the plaintiff. Title to this oil did not pass from plaintiff to Allied, nor did Allied have a lien thereon. Even if plaintiff had defaulted in performing these contracts, instead of Allied, no lien could have attached under subdivision 5 of former section 150 of the Personal Property Law (in effect in New Jersey as part of the Uniform Commercial Code at the time of these transactions) unless the buyer, although free from fault, has the goods in his possession or control. In Railroad Waterproofing Corp. v. Memphis Supply (303 N. Y. 849, 851) we said that even if the buyer “ had a lien, it was lost upon its surrendering possession ” of the goods. Here it could not be contended that this vegetable oil was ever in the possession of Allied. It was bailed with Field as an independent warehouse in order to keep it out of the possession of Allied until its purchase price had been fully paid.
*354 Under this statute Allied could have had no lien, even if it were not in default in performance of the contract by neglecting to pay the balance of the purchase price. It was firmly settled in New York (Pirman v. Kurtz, 267 App. Div. 258, 260 and cases cited) and in New Jersey (Lizak v. Rottenbucher, 140 N. J. Eq. 76) that one who has failed to perform his part of an executory contract of sale may not recover the purchase money he has paid thereon. It was so held also in most of the rest of the United States (see Ann. to Thach v. Durham, 120 Col. 253, 11 ALR 2d 701, 705 seq.; continued 1 ALR 2d Later Case Service [1965], pp. 1141-1142). This has been changed by the Uniform Commercial Code (N. J. Stat. Ann., 12A:2-718, subd. [2], par. [b], eff. Jan. 1, 1963; L. 1962, ch. 553, § 2-718, subd. [2], par. [b], eff. Sept. 27, 1964). These sections destroy the old rule that the buyer forfeits his down payment by breaching the contract, by providing that where the seller justifiably withholds delivery of goods because of the buyer’s breach, the buyer is entitled to restitution of any amount by which the sum of his payments exceeds reasonable liquidated damages specified in the agreement, or ‘ ‘ in the absence of such terms, twenty per cent of the value of the total performance for which the buyer is obligated under the contract or $500, whichever is smaller.”
That does not necessarily mean, however, that plaintiff would be entitled to retain as against Allied only $500 of the $217,279.66 which was Allied’s part payment on these contracts. The Uniform Commercial Code allows the seller actual damages where liquidated damages have not been stipulated (N. J. Stat. Ann., 12A:2-718, subd. [3], par. [a]; N. Y. Uniform Commercial Code, § 2-718, subd. [3], par. [a]), which refers back to the remedies of a seller under a contract of sale arising from default of the buyer. These are comprised by section 2-703 through section 2-710 of the Uniform Commercial Code adopted in each State. They include (§ 2-708) damages measured by “ the difference between the market price at the time and place for tender and the unpaid contract price ” together with any incidental damages provided by section 2-710, plus whatever amount may be necessary “ to put the seller in as good a position as performance would have done ”.
Manifestly, if Allied defaulted on these contracts, plaintiff was entitled to retain as against Allied so much of the $217,279.66 *355 part payment as would be necessary to offset its.damages due to a falling market plus incidental damages, such, as extra transportation, storage, legal expense, and other items to which it was subjected by Allied’s default.
Even if it were to be assumed that Allied had some interest in plaintiff’s vegetable oil, or that it became entitled to a refund of its deposit on the purchase price, or some portion thereof, the law both of New York and of New Jersey is to the effect that any such issue would be between Allied and plaintiff, which was entitled to possession of this oil under its warehouse receipts issued by defendant, and that defendant could not offset any personal liability which plaintiff might have to Allied or any interest which Allied might have in the goods. A warehouseman is liable in this State to the holder of the warehouse receipt for the full value of the merchandise, even where the holder of the receipt has only a special interest in the property. (Einstein v. Dunn, 61 App. Div. 195, affd. on opn. at Appellate Division 171 N. Y. 648; Mechanics Traders’ Bank v. Farmers & Mechanics’ Nat. Bank, 60 N. Y. 40.) Under those eases it is incumbent on the party entitled to possession to account for the surplus, if any, to the owners of other interests in the goods. Here plaintiff was entitled to possession against the warehouseman, and likewise against Allied until the purchase price was paid in full. Defendant cannot escape its obligation to return to plaintiff the entire amount of vegetable oil covered by these warehouse receipts by reason of the relationship between plaintiff and Allied, particularly in an action to which Allied is not a party. Nor was it necessary to plaintiff to join Allied (or its trustee in bankruptcy) as a party in order to recover from defendant for all of the oil which it had deposited.
The difficulty, as we view it, with the reasoning of the Appellate Division is that it prejudges the rights and liabilities between plaintiff and Allied without Allied’s being before the court, and gives the benefit to defendant without recourse by plaintiff to protect itself against whatever personal liability plaintiff might be under to return part of the deposit to Allied or its trustee in bankruptcy, and to whatever portion of the $217,279.66 plaintiff might have been entitled to retain by reason of Allied’s default. Defendant cannot be credited with part of a down payment which plaintiff may be required to restore to *356 Allied’s estate in bankruptcy, nor is defendant entitled to be credited with whatever portion of the $217,279.66 deposit plaintiff is entitled to retain to compensate it for damages against Allied due to Allied’s breach of contract.
Under Einstein v. Dunn (supra) and Mechanics & Traders’ Bank v. Farmers & Mechanics’ Nat. Bank (supra), plaintiff may recover for the full value of the bailed merchandise even if plaintiff’s interest consisted merely in having a lien upon the bailed oil to secure the balance of the purchase price which Allied had agreed to pay.
The Appellate Division erred in assuming that this situation is analogous to that which was presented in Corn Exch. Bank v. American Dock & Trust Co. (163 N. Y. 332). There a plaintiff bank had loaned money on a warehouse receipt made without actual authority by the warehousing company to the order of its president, who, without authority, delivered it to the bank as collateral security for a loan to himself. The warehousing company never did have any cotton in storage which it purported to represent, but was estopped to deny that its president had authority to issue the warehouse receipt. There never having been any cotton or other merchandise in existence which was behind the receipt, it was held that the bank could recover no more against the warehousing company than the amount of its loan to the president of the warehouse against this spurious document. In that case there never was a conversion; there was no merchandise to convert. The court recognized the rule that where there has been a conversion the measure of the damages is the full value of the merchandise called for by the warehouse receipt, stating (p. 339) that this rule “is undoubtedly correct in cases in which the warehouse company has not been defrauded ”, but distinguished between the situation here present where there were actual goods in storage and the special situation there presented where there never was any conversion and the warehouse receipt was fictitious. Under such circumstances, the bank could not recover more than the money which it had paid out on the strength of a spurious document, together with the interest. The rule could not be applied in that case that the holder of a warehouse receipt can recover the full value of converted property, for the reason that no property had been converted, and there was no chance that the holder of the receipt *357 could be called upon to account for the surplus, if any, to the purchaser or owner of a general proprietary interest, since there was no such interest and no such person was in existence. To have allowed a recovery in the Corn Exchange Bank case in the amount of the value of goods which never had any existence, would have represented a pure windfall to the bank because there never had been any actual transaction except the bank’s loan of money to the warehousing company’s president. In the case at bar it is not claimed that plaintiff’s warehouse receipts were forged or issued without authority against nonexistent merchandise.
It is probably with the Corn Exchange Bank case in mind that the Appellate Division dwelt on the possibility that the vegetable oil covered by the warehouse receipts in suit never reached the defendant’s warehouse. If no oil was ever in storage there for plaintiff’s account, that might lend some analogy to the situation in the Corn Exchange Bank case. But the difficulty with that reasoning is that there is no basis in the record for assuming that this oil was never received at defendant’s warehouses. Here we are not dealing with fictitious cotton, which never was in being as in the Corn Exchange Bank case, but with 9,206,740 pounds of fully refined soybean oil produced by plaintiff and shipped to itself by railroad bills of lading at Bayonne, New Jersey. The Appellate Division’s opinion says that we cannot know that it ever entered defendant’s tanks there. This is pure speculation. The issuance by defendant of its warehouse receipts to plaintiff stating that it had the oil in storage and the series of monthly statements issued by defendant saying that the oil was still in the warehouse are evidentiary facts establishing that defendant received the oil. There might be a triable issue on whether defendant got the oil if there were affidavits in opposition presenting evidentiary facts contradicting defendant’s warehouse receipts and business entries. In the absence of such contradictory evidence, we cannot speculate that defendant never received this oil.
Where, as here, the bailed merchandise was in existence and traced into the possession of the warehouseman, and has later been converted, there is no basis for applying the rule in the Corn Exchange Bank case (where there never were any goods and never was any conversion). Instead, the Mechanics & Traders’ *358 Bank rule applies that where there has been conversion of merchandise, the holder of the warehouse receipt is entitled to recover for the full value of the merchandise, and the holder of the receipt must then fulfill his obligations to other contracting parties who were not, themselves, entitled to possession of the merchandise at the time of its conversion. This recognized rule in New York State is also law in New Jersey (Central R. R. v. Bayway Refining Co., 81 N. J. L. 456; Hudson Tr. Corp. v. Antonucci, 137 N. J. L. 704; First Nat. Acceptance Corp. v. Annett, 121 N. J. L. 356).
That being so, we need not consider whether plaintiff would be entitled to offset all or any part of the $217,279.66 deposit against a liquidated claim of $510,896 against Allied which arose out of another contract entered into on November 14, 1963, five days before Allied’s bankruptcy (see Addington v. Forsyth Metal Goods Co., 234 N. Y. 93). That would, in any event, represent a controversy between plaintiff and Allied (or its trustee in bankruptcy) which could not be decided in this action to which neither Allied nor its trustee is a party.
In other respects it is our conclusion that the order of the Appellate Division should be affirmed.
On its appeal defendant (Field) contends that there is a triable issue respecting whether it exercised reasonable care as bailee of this oil. Defendant points to section 7-204 of the Uniform Commercial Code (N. J. Stat. Ann., 12A:7-204), in effect in New Jersey at the time, providing that a warehouseman is liable for damages for loss or injury to the goods “ caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances but unless otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care.” Section 7-403 of the same statute provides that the bailee must deliver the goods to a person under the document unless and to the extent that the bailee establishes “ damage to or delay, loss or destruction of the goods for which the bailee is not liable ”.
These sections of the Uniform Commercial Code appear not to have altered for present purposes the prior law, either in New York or in New Jersey. Section 21 of the Uniform Warehouse Receipts Act (General Business Law, former § 107) provided (like Uniform Commercial Code, § 7-204) that a warehouseman *359 shall not be liable for loss or injury to the goods which could not have been avoided by the exorcise of reasonable care, and section 8 (General Business Law, former § 95), like section 7-403 of the Uniform Commercial Code, stated that a warehouseman is liable for nondelivery of bailed goods ‘ ‘ in the absence of some lawful excuse provided by this article ”. Citing these sections, the Appellate Division correctly stated (22 A D 2d 420, 429-430) that a warehouseman ‘ ‘ has the burden of explanation for any loss or disappearance of the property bailed. * * * It is not enough to assert that care was taken, describing the practices used, when the disappearance of the oil remains wholly unexplained ” citing Castorina v. Rosen (290 N. Y. 445, 447). In the case cited the theft of an automobile from a garage owner was identified in time and place. It was damaged while being driven without permission by a watchman in the employ of the garage, and the court held that the garage proprietor would not be liable if he used due care in the selection of this watchman. In the opinion by the present Chief Judge the rule applicable here was stated in the form of a quotation from Claflin v. Meyer (75 N. Y. 260, 264): “‘If he [the bailor] proves the demand upon the warehouseman and his refusal to deliver, these facts unexplained are treated by the courts as prima facie evidence of negligence; but if, either in the course of his proof or that of the defendant, it appears that the goods have been lost by theft, the evidence must show that the loss arose from the negligence of the warehouseman. ’ ”
To the same effect are the cases of Jay Howard, Inc. v. Rothschild (16 A D 2d 628) and Fidelity & Guar. Ins. Corp. v. Ballon (280 App. Div. 373). The New Jersey cases cited for defendant as supporting its position are in accord with the law of New York. Each involved destruction of bailed goods by fire, at some definite time, whereupon the question resolved itself into whether the fire resulted from negligence of the bailee (New Jersey Mfrs. Assn. Fire Ins. Co. v. Galowitz, 106 N. J. L. 493; Berkowitz v. Pierce, 129 N. J. L. 299). Veihelmann v. Manufacturers Safe Deposit Co. (303 N. Y. 526) does not change the legal requirement that a bailee make some explanation of a loss. The facts there concerned whether a bank was entitled to the dismissal on the law of an action by a renter of a safe-deposit box suing for disappearance of cash from the box. There was *360 grave doubt that the bank was a bailee, inasmuch as it was not supposed to have access to its customer’s safe-deposit box. The outcome of that action turned upon whether the bank had used reasonable care in guarding the box. The bank did not stand in a position analogous to that of a warehouseman, nor is it a case, like the present, involving the ordinary relationship between bailor and bailee. The Appellate Division well said that it is self-contradictory for a warehouseman simultaneously to assert due care and total lack of knowledge of what happened, and that it would establish an unwise rule to place a bailee in better position to be excused if he knew less about the disappearance of the goods than if he knew more. That is the underlying reason for the time-honored law of New York and New Jersey requiring a warehouseman to make an explanation of injury or loss in the case of bailed merchandise, which has been continued and not abolished by the Uniform Commercial Code.
One other incident in the narrative of these events requires mention. On May 20, 1963 (about six months before the bankruptcy of Allied) possession of plaintiff’s vegetable oil was transferred by defendant to another and newly formed subsidiary of Amexco named American Express Warehousing Ltd. (hereafter called Limited), which assumed the liability of defendant with respect to the transactions in suit. The first cause of action, which we have been discussing, is based on the disappearance of this oil without explanation between its delivery to defendant in March and April, 1963, and November 21, 1963, which was the date when the loss of this oil was discovered following the bankruptcy of Allied. Defendant (Field) contends that under these allegations the oil may have been lost after May 20, 1963, when it turned over possession to Limited, and asserts that it is not liable for negligence of Limited. This point would be frivolous since, as the Appellate Division said, “It is rather elementary law that the delegation of a responsibility to another does not, ipso facto, discharge the obligation of the first obligor ” (Rochester Lantern Co. v. Stiles & Parker Press Co., 135 N. Y. 209, 216-217), unless there was a novation under which plaintiff agreed to substitute the liability of Limited for that of defendant Field. The latter argues that a triable issue has been presented concerning whether there was such a novation. This argument fails for the reasons stated by the Appellate *361 Division. It is undisputed that plaintiff lacked notice of this transfer of possession from one subsidiary of Amexco to another until about two weeks after it occurred, when it received letters from Limited stating that possession had been transferred to it by Field, and that 1 ‘ As soon as new warehouse receipts have been printed, we shall request from you the surrender of the old receipts in exchange for receipts of the new corporation. For the immediate present, we shall use the old form of receipt with appropriate change in the name.” The letters further informed that Limited had assumed all of the obligations of defendant with respect to plaintiff’s warehouse receipts and it gave the name of the man who was authorized to sign warehouse receipts in behalf of Limited. Plaintiff never surrendered its warehouse receipts issued by defendant in exchange for new receipts to be issued by Limited. When plaintiff received these letters from Limited dated May 31, 1963, it had 47,977,800 pounds of oil supposedly in the warehouse, the equivalent of 800 tank carloads. It is true that subsequently plaintiff signed forms directing Limited to release 38,771,060 pounds which it sold and delivered to Allied Crude Vegetable Oil Refining Corporation and for which Allied paid. The oil thus sold and delivered to Allied did not include the oil involved in this suit, concerning which no delivery orders were issued to Limited. These facts, and the facts that plaintiff did not remove its 800 carloads of soybean oil after being informed of the transfer of custody to Limited and otherwise remained silent, are adduced by defendant in support of its contention that there is at least a triable issue concerning whether plaintiff released defendant from the obligations imposed upon it by the issuance of its warehouse receipts accepting in substitution the liability of Limited—i.e., a novation.
These facts were insufficient to create a triable issue concerning whether plaintiff released defendant (Field) from its obligations under these warehouse receipts. There are no evidentiary facts in the affidavits to indicate that it did so.
This same transfer of possession from defendant Field to Limited on May 20, 1963 also forms the basis for plaintiff’s second cause of action, which, like the first cause of action, is in conversion, but instead of being based on the disappearance of the oil at some unexplained time prior to November 21, 1963, is founded on the specific act of defendant Field in transferring *362 possession to Limited on May 20, 1963. It appears to be of some consequence to plaintiff to establish that liability accrued prior to the end of May, 1963, at which date policies of ware-housemen’s insurance ceased to be in effect. If the loss be established while this insurance was in force the prospect of collecting the judgment for plaintiff appears to be enhanced. With that we are not concerned.
It is true, as the Appellate Division has said, that generally the unauthorized transfer of bailed property, for whatever purpose even for a temporary period, is a conversion. It is likewise true, as was said in the same connection, that such an action may be ratified by the bailor. In other words, it is possible that plaintiff ratified the transfer of possession of its vegetable oil from defendant Field to Limited, but without substituting Limited for Field as the party liable for the return of the oil. In our opinion the proof in the affidavits is sparse that plaintiff ratified the transfer of possession to Limited, but the facts concerning ratification by plaintiff (unlike the facts regarding the disappearance of the oil) are peculiarly within the knowledge of the plaintiff. We are told (Field’s brief, p. 18) that after the decision of the Appellate Division, severing the second cause of action, depositions were taken of officers or employees of plaintiff which contained ‘ ‘ repeated admissions ’ ’ that plaintiff ‘ ‘ had no objection to the transfer of custody of the oil from Field to Limited.” Field applied for an examination before trial of plaintiff on this aspect of the case before the decision of this motion for summary judgment, but did not succeed in getting it until afterward. We have held that summary judgment is not justified where there are likely to be defenses that depend upon knowledge in the possession of the party moving for judgment, which might well be disclosed by cross-examination or examination before trial (Kamen v. Metropolitan Life Ins. Co., 6 A D 2d 406, affd. 6 N Y 2d 737; Suslensky v. Metropolitan Life Ins. Co., 180 Misc. 624, affd. 267 App. Div. 812; West Virginia Pulp & Paper Co. v. Merchants Mut. Ins. Co., 10 A D 2d 451; 5 Carmody-Wait, New York Practice, p. 145). For this reason, we hold that the Appellate Division correctly decided that a triable issue is presented on the second cause of action whether plaintiff’s vegetable oil was converted by the transfer of custody from Field to Limited on May 20,1963.
*363 The other points raised on the appeal by defendant Field merit but passing mention. One is that plaintiff should be obliged to accept a proportionate share of the conglomerate found on hand in the tanks of these subsidiaries of Amexco. This consisted mostly of acid soap stock, fish oil and water. These mixed fluids were not the edible fully refined vegetable oil delivered to Field by plaintiff. An argument is made that the warehouse receipts showed plaintiff’s refined vegetable oil to be fungible, and granted permission to mix it with similar oil owned by other depositors. From that it is said that a warehouseman need do no more than take the word of other customers concerning the nature of the fluids which are being placed in the tanks of the warehouseman, and that if it be soap acid or fish oil then that is plaintiff’s misfortune. It is a sufficient answer to that contention that plaintiff is not required to acquit the warehouse in whole or in part by taking in return a commodity or blend of commodities of a different nature from that which was deposited.
The other point raised by Field is that these fluid substances, whatever they may have been, were sold by Limited’s trustee in bankruptcy and that plaintiff is required to take a proportionate share of the value of this material. Plaintiff has filed a claim in bankruptcy against Limited, expressly reserving its rights against Field, and we suppose that unless plaintiff is paid in full by Field or its insurers (which is most improbable) it will be entitled to some share in the bankruptcy assets of Limited upon its claim against Limited’s trustee. If plaintiff is paid in full by or through Field, then we have no doubt that Field would be subrogated to plaintiff’s interest in the assets in bankruptcy of Limited which would otherwise come to plaintiff through the claim which it has filed with Limited’s trustee.
The judgment appealed from should be reversed insofar as it modifies the order and judgment of Special Term and the judgment of Special Term entered June 11,1964 should be reinstated, with costs in this court and in the Appellate Division to plaintiff-respondent-appellant against the defendant-appellant-respondent. Interest, under our theory of the measure of damage, would accrue from the dates of the warehouse receipts issued by defendant for plaintiff’s vegetable oil. Special Term awarded interest from May 16, 1963, which was subsequent to the dates of the warehouse receipts, apparently upon the theory that the oil *364 disappeared at or about that date. We are not ruling on when the oil disappeared, but the date from which interest was accrued by Special Term is not challenged by plaintiff and is left standing by us for the reason that under our measure of damage the first cause of action is deemed to have accrued when the warehouse receipts were issued.
Chief Judge Desmond and Judges Dye, Burke, Scileppi and Bergan concur with Judge Van Voorhis; Judge Fuld taking no part. s
Judgment entered April 29, 1965 upon the order of the Appellate Division reversed and that of Special Term entered June 11, 1964 reinstated, with costs in this court and in the Appellate Division to plaintiff against defendant.