77 N.Y.2d 200 (1990)
Art Masters Associates, Ltd., et al., Respondents,
v.
United Parcel Service, Appellant.
Court of Appeals of the State of New York.
Argued September 11, 1990.
Decided December 20, 1990.
George G. Gallantz, Francis D. Landrey, Scott A. Eggers, James Crawford, Steve D. Shadowen and Nicolette Parisi for appellant.
Alfred C. Polidore for respondents.
Kenneth E. Siegel, of the Virginia Bar, admitted pro hac vice, for American Trucking Associations, Inc. and another, amici curiae.
Chief Judge WACHTLER and Judges HANCOCK, JR., and BELLACOSA concur with Judge ALEXANDER; Judge TITONE dissents and votes to affirm in a separate opinion in which Judge SIMONS concurs; Judge KAYE taking no part.
*202 ALEXANDER, J.
In I.C.C. Metals v Municipal Warehouse Co. (50 N.Y.2d 657), we held that in an action for conversion, where a warehouse fails to adequately explain its failure to return bailed goods, it *203 is not entitled to the benefit of its contractual limitation of liability. Thus, conversion is presumed and the bailor is entitled to recover the full value of the undelivered goods without proving a conversion by the bailee.
In this case, the Appellate Division concluded that this presumption of conversion also applies to common motor carriers who fail to deliver bailed goods upon demand. That court affirmed Supreme Court's grant of summary judgment to plaintiff on its common-law negligence cause of action, but denied defendant's motion for summary judgment on plaintiff's cause of action for conversion and severed that cause. The case is before us by leave of the Appellate Division, upon the certified question: "Was the order of this court dated December 29, 1989 properly made?" For reasons that follow we reverse the order below and answer the certified question in the negative.

I
In the spring of 1985, after having acquired a number of original Erte paintings from a gallery in England, Art Masters Associates, Ltd. and Kram Trading[1] consigned six of the paintings to Benjamin's Art Gallery in Buffalo, New York, to be sold. When by July, the paintings had not been sold, Art Masters and Benjamin agreed that the paintings would be returned to Art Masters.
Benjamin thereafter delivered the paintings to defendant United Parcel Service (UPS) for delivery to Art Masters in Brooklyn, New York, and filled out a "pick-up" slip, which provided, in part, that "[u]nless a greater value is declared in writing on this receipt, the shipper hereby declares and agrees that the released value of each package * * * covered by this receipt is $100 which is a reasonable value under the circumstances surrounding the transportation." Benjamin declared the value of the package to be $999.99 and paid $2.25 for the shipment based on a fee schedule of 25 cents for each $100 increment of value over the initial $100 in accordance with the provisions of the UPS tariff filed with and approved by the Interstate Commerce Commission (ICC) and the New York State Department of Transportation.
Although the paintings were scheduled to arrive on July 19, *204 1985, Art Masters never received them. On that day, the Art Masters' employee left the premises for some 15 minutes and when she returned, she saw a UPS delivery truck in the next block. She asked the driver whether any delivery had been made to Art Masters and was told that a package had been left at the side door of the building. The package was not there and was never located. In response to a request that a trace be made, UPS produced a copy of a delivery sheet containing an illegible signature. The signature apparently did not belong to any Art Masters' employee.
Art Masters declined UPS' tender of $999.99, the declared value of the package, and commenced this suit seeking $27,000 as the full value of the six paintings. The company alleged two causes of action; the first sounding in negligence-based common-law liability of common carriers and the second in conversion. Among the affirmative defenses interposed by UPS was the limitation of liability based on the declared value of the package.
Motions for summary judgment by both parties ensued. Supreme Court granted summary judgment to Art Masters on that branch of its motion predicated on UPS' common-law liability, inasmuch as UPS failed to demonstrate that the nondelivery did not result from its negligence. Damages were limited, however, to the $999.99 declared value.[2] The court granted summary judgment to UPS on the conversion cause of action, however, concluding that because UPS was a common carrier operating under the jurisdiction of the ICC, Federal law was applicable. Thus Art Masters' failure to demonstrate that the loss was due to UPS' willful or intentional conduct was fatal to its conversion cause of action.
In denying summary judgment to UPS on the conversion claim, the Appellate Division, concluding that Supreme Court erred in applying Federal law, held that State law applied and that under I.C.C. Metals v Municipal Warehouse Co. (50 N.Y.2d 657, supra), "Art Masters established a prima facie case of conversion * * * based upon its undisputed allegations that Benjamin delivered the Erte paintings to UPS and that Art Masters never received them." (153 AD2d 41, 48-49.)
UPS argues that the presumption of conversion applied to warehouses in I.C.C. Metals should not be extended to regulated *205 motor carriers because to do so would conflict with the intent of the New York State Legislature that State law, as embodied in section 181 of the Transportation Law,[3] be consistent with the Federal law as embodied in the Carmack Amendment to the Interstate Commerce Act (49 USC §§ 10730, 11707).[4] UPS argues that because such a presumption of conversion is not applied under Federal law, it should not be applied as a matter of State law. Because no distinction between the applicable Federal and State statutes and their underlying purposes would support our not following the Federal scheme and for the reasons stated below, we agree with UPS.

II

A
Although common carriers are precluded from exempting themselves from all liability for loss or damage or injury to goods entrusted to them, both the Carmack Amendment (49 USC § 10730) and the New York Transportation Law (§ 181) permit regulated motor carriers to limit their liability for loss, *206 damage or injury to such property to the agreed-upon declared or released value of the property.
It has long been the Federal law governing interstate shipments of goods that stipulations between a shipper and a carrier limiting the carrier's liability for the loss, damage or injury to goods entrusted to the carrier are enforceable as supported by sound principles of fair dealing and freedom of contracting (Adams Express Co. v Croninger, 226 US 491, 511) and cannot be avoided "by suing in trover and laying the failure to deliver as a conversion" (American Ry. Express Co. v Levee, 263 US 19, 21). The Supreme Court held in American Ry. Express Co. v Levee, that a local rule "applied as to the burden of proof narrowed the protection that the [carrier] had secured, and therefore contravened the law." (Id.) As the Ninth Circuit Court of Appeals observed in Glickfeld v Howard Van Lines (213 F.2d 723, 727) "the cases are uniform in holding that the conversion doctrine is pertinent only when there has been a true conversion, i.e., where the carrier has appropriated the property for its own use or gain." Federal courts routinely require that in the presentation of claims for damages for the nondelivery of goods, in order to avoid application of agreed-upon limitation of liability, a claimant must establish a true conversion  a defendant's willful or intentional misconduct occasioning the nondelivery; where no such proof is forthcoming, the agreed-upon limitation of liability is enforced (see, Lerakoli, Inc. v Pan Am. World Airways, 783 F.2d 33, 37-38, cert denied 479 US 827; Nippon Fire & Mar. Ins. Co. v Holmes Transp., 616 F Supp 610, 611-612; see also, Vogelsang v Delta Air Lines, 302 F.2d 709, 712, cert denied 371 US 826).

B
This Court, likewise, has held that where there is an agreed-upon limitation of liability in a contract of carriage, the carrier may not be cast in damages, upon a theory of conversion, for the full value of the property it failed to deliver unless there is proof of actual conversion (see, Wamsley v Atlas S. S. Co., 168 N.Y. 533).[5] In Wamsley, we observed that
*207 "There are cases in which evidence of demand and refusal is sufficient to sustain a recovery in conversion, but this rule applies against common carriers only in exceptional cases. The general rule is that a common carrier is not liable in conversion for mere non-feasance, although he may be liable for negligence. So on the contrary he may be held in trover when he is guilty of misfeasance, although the wrong may have been unintentional." (Id., at 536.) In Wamsley, we relied upon our prior holding in Magnin v Dinsmore (70 N.Y. 417) that while proof of nondelivery, along with other evidence, may establish negligence, "[a] mere non-delivery will not constitute a conversion" (id., at 417; see also, Magnin v Dinsmore, 62 N.Y. 35) and the plaintiff could not avoid the limitations of the contract of carriage by proof of nondelivery alone. Thus, it has long been the settled rule in this State that a carrier is entitled to the benefit of a contractual limitation upon its liability for nondelivery unless the shipper establishes that the nondelivery resulted from the carrier's affirmative wrongdoing (D'Utassy v Barrett, 219 N.Y. 420, 424; see also, Reichman v Compagnie Generale Transatlantique, 290 N.Y. 344, 352, cert denied 320 US 771).
Art Masters argues, as does the dissent, that this rule has been changed by our holding in I.C.C. Metals (50 N.Y.2d 657, supra) a case involving the failure of a warehouse to deliver, on demand, valuable goods stored with it for approximately two years. There, the warehouse was unable to offer more than speculation as to the reason the goods were missing. We held "that proof of delivery of the stored property to the warehouse and its failure to return that property upon proper demand suffices to establish a prima facie case of conversion" (id., at 660) and divests the warehouse of the benefit of the liability-limiting provisions of the storage agreement. The burden was placed upon the warehouse to come forward with evidence sufficient to prove that its failure to return the property did not result from its conversion of that property to its own use and thus overcome the presumption of conversion. We held that only if the warehouse proffered sufficient proof to satisfy the trier of fact of the truth of its explanations would the bailor be required to prove the warehouse at fault in order to recover.
Our decision in I.C.C. Metals however, gave no indication that we intended to apply the presumption of conversion to common motor carriers. Quite the contrary; our consideration was directed to the question of "whether a warehouse which *208 provides no adequate explanation for its failure to return stored property upon proper demand is entitled to the benefit of a contractual limitation upon its liability." (Id., at 660 [emphasis supplied].)[6] Considering the issue now, we conclude that the presumption of conversion articulated in I.C.C. Metals should not be extended to common motor carriers. Common carriers of property by motor vehicle are highly regulated in New York under the provisions of article 8 of the Transportation Law (see, Transportation Law § 170 et seq.) as are common motor carriers engaged in interstate commerce (see, 49 USC § 10521 et seq.). The New York State Legislature has consistently expressed an intent that intrastate motor carriers in this State be regulated under statutory schemes consistent with the Federal regulatory scheme relating to motor carriers engaged in interstate commerce. In 1906, Congress enacted the Carmack Amendment permitting carriers to limit their liability to the declared or released value of goods so long as that declared value determined the shipping rates charged and an opportunity to declare a higher value was afforded (see, Act of June 29, 1906, ch 3591, 34 US Stat 584, 585). Shortly thereafter, in 1907, our Legislature enacted section 38 of the Public Service Commissions Law to essentially mirror the provisions of the Carmack Amendment (see, L 1907, ch 429).
Congress' Motor Carrier Act of 1935 (49 US Stat 543) incorporated the Carmack Amendment. New York's Legislature followed suit in 1938, enacting article 3-B of the Public Service Law (L 1938, ch 543, § 2) also incorporating the New York version of the Carmack Amendment now located at section 181 of the Transportation Law.[7] This 1938 legislation followed the recommendation of the Joint Legislative Committee on Motor Carriers and Transportation that: "intrastate motor carriers should be placed within the jurisdiction of a State regulatory body empowered to regulate intrastate operations along lines similar to the Federal Motor Carrier Act, so *209 as to secure complete coordination between Federal and State authorities in the regulation of motor transportation. State regulations and Federal regulation should go hand in hand. There should be cooperation between this State and the Federal Government so far as it is practicable" (Report of Joint Legis Comm on Motor Carriers and Transportation, 1936 NY Legis Doc No. 93, at 15 [emphasis supplied]).
Given the close similarity between the Federal and State statutes under consideration and the common purpose served by the two statutes, it is consistent with sound principles of statutory construction, that the statutes be construed harmoniously (see, All Seasons Resorts v Abrams, 68 N.Y.2d 81, 87; Matter of Fink v Lefkowitz, 47 N.Y.2d 567, 572, n). Moreover, construing the provisions of Transportation Law § 181 consistent with the construction of the Carmack Amendment by the Federal courts comports with the prior decisions of this Court limiting the liability of a common carrier to the declared or released value in respect to claims of conversion based solely on nondelivery of shipped goods (see, D'Utassy v Barrett, 219 N.Y. 420, supra; Wamsley v Atlas S. S. Co., 168 N.Y. 533, supra). Contrary to the assertions of the dissent, extension of the I.C.C. Metals rule to common carriers is not merely a matter of procedure; it would effectively change the substantive law of conversion as applied to motor carriers by allowing recovery without any affirmative proof of the carrier's wrongdoing, and thus "narrow[ing] the protection * * * the [carrier] had secured" (see, American Ry. Express Co. v Levee, 263 US 19, 21, supra). Indeed, it will actually shape the outcome of a case because it grants the full relief sought  the actual value of a shipped parcel notwithstanding the parcel's declared value  upon a mere allegation of nondelivery solely because of the carrier's inability to explain the parcel's whereabouts. Such a rule hardly comports with sound principles of fair dealing and freedom of contract and indeed would be "unjust and contrary to the policy of the law" (D'Utassy v Barrett, 219 N.Y. 420, 425, supra).
Accordingly, the order of the Appellate Division should be reversed, with costs, and defendant's motion for summary judgment dismissing plaintiffs' second cause of action granted. The certified question should be answered in the negative
TITONE, J. (dissenting).
In refusing to apply the holding in I.C.C. Metals v Municipal Warehouse Co. (50 N.Y.2d 657) to the present case involving a common carrier, the majority has, *210 without explanation, revived a line of cases that was expressly discarded as "essentially irreconcilable" in I.C.C. Metals (id., at 667) and, further, has ignored the sound policy considerations rooted in "practical necessity" on which the I.C.C. Metals decision was based. In the process, the majority has created a dual standard of proof for conversion actions against bailees  one for actions in which the bailee is a warehouse operator and another for cases in which the bailee is a common carrier. Since, as discussed below, the majority's stated reasons for differentiating among bailees in this manner are unpersuasive, I offer my own dissenting views.
At the outset, I would stress that the issue here is not, as the majority opinion suggests, whether "a carrier is entitled to the benefit of a contractual limitation upon its liability for nondelivery" unless the carrier's affirmative wrongdoing is established (majority opn, at 207, citing D'Utassy v Barrett, 219 N.Y. 420, 424). As is true under the applicable decisional law at both the State and Federal levels, a carrier may generally limit its liability for lost packages to the packages' declared value (see, 49 USC § 10730 [Carmack Amendment]; Transportation Law § 181), but such limitations do not apply when the carrier has been guilty of conversion (e.g., Bank of Oswego v Doyle, 91 N.Y. 32; Glickfeld v Howard Van Lines, 213 F.2d 723). This exception to the general rule, which is acknowledged by both parties, is based on the sound premise that no party should be able to insulate itself by contract from liability for its own intentional torts (see, e.g., Reichman v Compagnie Generale Transatlantique, 290 N.Y. 344, 352, cert denied 320 US 721).
Accordingly, as even defendant concedes, a carrier may be held liable for the full value of undelivered goods, despite a lower "declared" value, if its responsibility for a conversion has been established under the prevailing rules of evidence. The problem in this case  a common one in cases involving failure to return bailed goods  is how the occurrence (or nonoccurrence) of a conversion is to be established. It is on this point that the Court's prior decision in I.C.C. Metals is instructive and, in my view, controlling.
In I.C.C. Metals v Municipal Warehouse Co. (50 N.Y.2d 657, supra), this Court held that in a conversion action based on a bailee-warehouse's failure to redeliver goods to the bailor, the bailor may prevail by simply showing that the goods were delivered to the bailee and were thereafter not returned *211 unless the bailee sustains the burden of coming forward with an explanation of what happened to the goods. This rule, which was derived from principles traditionally applied in negligence actions against bailees (e.g., Stewart v Stone, 127 N.Y. 500; Claflin v Meyer, 75 N.Y. 260; see, PJI 4:93, at 1090; Richardson, Evidence § 109 [Prince 10th ed]), does not shift the burden of proof to the bailee. Rather, as the I.C.C. Metals Court observed (supra, at 666), it merely places the initial onus of explaining the circumstances surrounding the loss on the party in the best position to know. Once that initial burden of explanation is sustained, the bailor must persuade the trier of fact, by a preponderance of the evidence, that the bailee was at fault (id.).
Faced with the question of whether this ancient rule of evidence for negligence actions was also applicable to conversion actions, the I.C.C. Metals Court examined the prior decisions on the subject (id., at 666-667). It compared the cases on which the majority now relies (Reichman v Compagnie Generale Transatlantique, 290 N.Y. 344, supra; Wamsley v Atlas S. S. Co., 168 N.Y. 533; see also, Central School Dist. No. 3 v Insurance Co., 43 N.Y.2d 878) with the cases not cited by the majority here, which held that a bailor establishes a prima facie case of conversion by simply proving delivery to the bailee and the bailee's failure to return them upon demand (Proctor & Gamble Distrib. Co. v Lawrence Am. Field Warehousing Corp., 16 N.Y.2d 344; Bank of Oswego v Doyle, 91 N.Y. 32, 41, supra; Claflin v Meyer, 75 N.Y. 260, 263, supra; see also, 1 Harper and James, Torts § 2.27). Finding the cases "essentially irreconcilable," the I.C.C. Metals Court decided to "re-examine the matter" entirely in light of the underlying policy considerations rather than attempting to engage in a pointless dissection of the case law (50 NY2d, at 667, supra). The majority now concludes that the I.C.C. Metals decision is not controlling in, and should not be extended to, conversion cases involving common carriers, which are subject to Federal regulation. In my view, however, neither conclusion is sustainable.
Initially, the majority concludes that in imposing the burden of explanation on the warehouse operator in the case before it, the I.C.C. Metals Court did not intend to "change" the law as it relates to other classes of bailees, most notably common carriers. That conclusion, however, rests on a very weak reed: i.e., the I.C.C. Metals Court's specific use of the terms "warehouse" and "stored property" in its opening description *212 of the issue before it (see, majority opn, at 207-208, 208, n 6, quoting 50 NY2d, at 660, supra). That no meaningful inference can be drawn from this stylistic happenstance is underscored by the fact that the I.C.C. Metals Court set forth its ultimate holding in significantly broader terms applicable to all bailees (50 NY2d, at 667, supra ["(w)e now conclude that there exists no sound reason to apply a different rule to (negligence and conversion actions) where, as here, the bailee comes forward with insufficient proof of its explanation for the loss of the bailed goods"] [emphasis supplied]). As the foregoing comparison reveals, there is little to be gained from a line-by-line textual analysis that focuses on the number of times  or the contexts in which  the I.C.C. Metals Court used terms that were descriptive of the specific parties before it rather than the applicable generic legal terms of "bailor" and "bailee".
More meaningful than a linguistic analysis is one that looks to the case law and underlying principles with which the I.C.C. Metals Court was concerned. In this regard, the I.C.C. Metals Court's undifferentiated references to cases involving warehouses and cases involving common carriers suggest that the limitation now identified by this majority was simply not contemplated by that Court (see, 50 NY2d, at 666-667, supra, citing Proctor & Gamble Distrib. Co. v Lawrence Am. Field Warehousing Corp., supra [warehouse]; Reichman v Compagnie Generale Transatlantique, supra [carrier]; Wamsley v Atlas S. S. Co., supra [carrier]; Bank of Oswego v Doyle, supra [carrier]; Claflin v Meyer, supra [warehouse]). Further, the policy considerations that the I.C.C. Metals Court deemed critical (see, at 215, infra) are equally applicable to most bailees, including carriers, regardless of the precise service they provide. Thus, in the absence of some highly persuasive circumstance justifying the superimposition of a new limitation, the I.C.C. Metals rule should be fully applicable in this situation.
The "persuasive circumstance" on which this majority relies is the existence of a Federal regulatory scheme which affects common carriers and provides a potential ground for differentiating carriers from warehouse operators. However, in my view, the existence of a Federal regulatory scheme is an insufficient ground to depart from the sound I.C.C. Metals evidentiary rule.
It is true, as the majority stresses, that our application of *213 the I.C.C. Metals burden of going forward to common carriers would render the rules governing intrastate conversion actions in New York somewhat different from those that govern in interstate disputes required to be settled under Federal law. It is also true that the State laws governing common carriers were intended to be applied in a manner consistent with the Federal regulatory scheme (see, Report of Joint Legis Comm on Motor Carriers and Transportation, 1936 NY Legis Doc No. 93, at 15 [hereinafter Joint Legis Rep]). Our State Legislature's preference for uniformity, however, is not necessarily contravened by applying a local rule of evidence such as the I.C.C. Metals rule that differs from the Federal equivalent. First, as the majority observes, the Legislature intended only that the Motor Carrier Act, now codified at section 181 of the Transportation Law, be applied "along lines similar to," rather than identical to, the Federal Motor Carrier Act to facilitate "cooperation between this State and the Federal Government so far as it is practicable" (Joint Legis Rep, at 15 [emphasis supplied]). New York's present rule for contractual limitations of liability is already quite "similar" to the Federal rule, since both schemes permit carriers to limit their liability by agreement to the declared value of the goods and both schemes would withhold the benefits of such agreements from carriers who have been guilty of conversion (see, Bank of Oswego v Doyle, 91 N.Y. 32, supra; Glickfeld v Howard Van Lines, 213 F.2d 723, supra).[1] As the Court noted in I.C.C. Metals (supra, at 667), a rule placing the burden of explanation on the bailee does not increase the bailee's duty of care, nor does it lead to the imposition of strict liability. Thus, application of the I.C.C. Metals rule would not lead to a divergence in the substantive Federal and State principles of tort law that are supposed to guide carriers' behavior.
Second, even as cited by the majority, the legislative aim in *214 enacting a local version of the Federal Motor Carrier Act was to secure "coordination between Federal and State authorities in the regulation of motor transportation" (Joint Legis Rep, at 15 [emphasis supplied]). Manifestly, a divergence in the rules of evidence affecting the manner in which the courts resolve litigated disputes between carriers and their customers does not in any way impair this goal of coordination and cooperation among regulatory officials at each level of government. Thus, contrary to the majority's suggestion, there is no clear legislative mandate requiring abrogation of the I.C.C. Metals rule in common carrier cases.
Nor are there any sound policy reasons supporting such a result. Contrary to the majority's assertion, it is simply not accurate to state that a rule relieving carriers of any duty to explain "comports with the prior decisions of this Court" (majority opn, at 209, citing D'Utassy v Barrett, supra; Wamsley v Atlas S. S. Co., supra; see also, majority opn, at 206-207). At least one prior decision of this Court (Bank of Oswego v Doyle, 91 N.Y. 32, supra) stated that a prima facie case of conversion against a carrier is established upon a showing that the goods were delivered to the carrier and not returned on the customer's demand. Moreover, of the two cases on which the majority now relies, only one is on point (Wamsley v Atlas S. S. Co., 168 N.Y. 533, supra). The other, D'Utassy v Barrett (219 N.Y. 420, supra), merely held that a conversion action did not lie when it was known that the goods were stolen by the bailee's employee, acting outside the scope of his employment, and the bailee himself was not culpable. The decision, which was based on a record in which the fate of the missing goods was stipulated, plainly has no bearing on the question presented here, i.e., how should the initial burden of demonstrating what happened to the goods be allocated. Finally, and most importantly, the majority's assertion about the import of the prior cases completely overlooks I.C.C. Metals' discussion of those cases, as well as its conclusion that the precedent was so hopelessly inconsistent as to be useless for purposes of analysis (50 NY2d, at 666-667, supra). Nothing in the present majority's analysis suggests a reason why that rejected line of cases should suddenly be revived. Indeed, the majority's attempt to suggest that Bank of Oswego v Doyle (supra) was superseded by Wamsley v Atlas S. S. Co. (supra; see, majority opn, at 206, n 5) is particularly ironic in light of I.C.C. Metals' explicit rejection of the latter case as useful precedent.
Additionally, although the majority places great weight on *215 it (majority opn, at 209), the theoretical value of applying the State scheme regulating contractual limitations of liability[2] so that it is perfectly "harmonious" with the Federal system is unimpressive when compared to the strong public policies favoring application of the I.C.C. Metals rule to common carriers. A bailor generally loses all control over its property after delivering it into the hands of a carrier, and thus it is the carrier that "is in the best, if not the only, position" to discover and explain the circumstances surrounding the property's disappearance or destruction (I.C.C. Metals v Municipal Warehouse Co., supra, at 665 [emphasis supplied]). A rule requiring the bailor to prove in the first instance that the property was lost through an act of conversion, rather than negligence or accident, would impose a "well nigh impossible burden" and would "encourage both dishonesty and carelessness" by enabling an unscrupulous carrier to obtain the benefits of a liability limitation clause through "the simple expedient of professing ignorance as to the fate of the goods." (Id., at 665, 667.) In light of these self-evidently important concerns, which the majority here has inexplicably ignored, it seems clear beyond peradventure that our State's public policy interest in imposing a minimal burden of explanation on the carrier, as previously recognized in I.C.C. Metals, more than outweighs our intangible interest in precise Federal-State uniformity and compels application of the I.C.C. Metals rule to this action arising under State law.
In sum, neither relevant considerations of public policy nor the existence of a different view among the Federal courts on the burden of proof problem supports the proposition that common carriers, unlike warehouse operators, should be exempt from having to explain the circumstances surrounding a loss or destruction of property entrusted to their care when challenged in an action alleging conversion. It is a legal commonplace that "if a fact lies peculiarly within the knowledge of a party, that party has the burden of proof with respect to it" (Richardson, Evidence § 99, at 78 [Prince 10th *216 ed]). A fortiori, the same should be true of the lesser burden of simply explaining what happened to a package that the carrier was given by its customer. Indeed, common carriers have long been burdened with the duty of coming forward with an explanation when they are charged with negligence (Richardson, op. cit., § 109; see, e.g., Claflin v Meyer, 75 N.Y. 260, supra). I see no reason why they should be relieved of that duty when the charge is the more serious one of conversion. Since the contrary rule endorsed by the majority, in effect, rewards those carriers that are least effective in managing their packages and keeping track of the goods entrusted to their care, it represents bad policy. Accordingly, I must, respectfully, dissent.
Order reversed, etc.
NOTES
[1] Both Art Masters Associates and Kram Trading are plaintiffs and will be referred to collectively as Art Masters.
[2] Neither party contests the Appellate Division's affirmance of that part of Supreme Court's order, thus the only issue before us is the effect of the I.C.C. Metals presumption of liability in the conversion cause of action.
[3] Transportation Law § 181 provides, in part: "Every common carrier of property by motor vehicle shall, upon demand, issue either a receipt or a bill of lading for all property delivered to it for transportation. No contract, stipulation or clause in any receipt or bill of lading shall exempt any common carrier of property by motor vehicle from any liability for loss, damage or injury caused by it to property * * * provided, however, that when expressly authorized or required by order of the commissioner a carrier may establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared * * *. Every common carrier of property by motor vehicle shall be liable for all loss, damage or injury to property caused by delay in transit due to negligence while the same is being carried by it, but in any action to recover for damages sustained by delay in transit the burden of proof shall be upon the defendant to show that such delay was not due to negligence. Nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which such holder has under existing law" (emphasis supplied).
[4] 49 USC § 10730 provides, in part: "The Interstate Commerce Commission * * * may require or authorize a carrier * * * providing transportation or service * * * to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation."
[5] The dissent's reliance upon Bank of Oswego v Doyle (91 N.Y. 32)  a case decided nearly 20 years before Wamsley  to support its contention that a contrary rule regarding carriers prevailed prior to I.C.C. Metals, is misplaced. Although the Oswego Court discusses carriers' liability, it is clear that the defendant's liability was predicated upon its capacity as a warehouseman (see, Bank of Oswego v Doyle, 91 NY, at 42).
[6] Although the dissent correctly indicates that the I.C.C. Metals Court spoke in terms of "all bailees" (dissenting opn, at 212), the question presented for decision pertained to warehouses only. It is axiomatic that "[p]rinciples are not established by what was said, but by what was decided * * * unless it relates directly to the question presented for decision" (People ex rel. Metropolitan St. Ry. Co. v State Bd. of Tax Commrs., 174 N.Y. 417, 447).
[7] Section 174 of the Transportation Law (L 1970, ch 267, § 3) embodied the recodification of section 63-v of the Public Service Law. In 1983, section 174 of the Transportation Law was recodified and is now section 181 (see, L 1983, ch 635, § 6).
[1] The majority cites American Ry. Express Co. v Levee (263 US 19, 21) for the proposition that "a local rule `applied as to the burden of proof narrow[s] the protection that the [carrier] had secured, and therefore contravene[s] the law.'" (Majority opn, at 206.) However, as is evident from the Supreme Court's subsequent references to that case, the quoted language in American Ry. means nothing more than that State courts must apply the Federal evidentiary rules governing the burden of proof when adjudicating rights arising under Federal law (e.g., South Buffalo Ry. Co. v Ahern, 344 US 367, 372; Robins Dry Dock Co. v Dahl, 266 US 449, 457; Davis v Wechsler, 263 US 22, 25). The case has no bearing on the entirely separate question of when Federal rules governing the burden of proof should be incorporated in actions such as this based on local law.
[2] The majority refers to the problem presented here as one of "statutory construction" (majority opn, at 209). However, the principle that contractual liability limitations are inapplicable in conversion cases is, in fact, a judicially created exception to the general statutory rule authorizing such limitations. A fortiori, the question of what rules of evidence and proof should be applied is, at least in this State, a matter for common-law analysis rather than statutory construction. Accordingly, the "rules" of statutory construction relied on by the majority are, at best, of limited utility here.